44 F.3d 1530
 UNITED STATES of America, Plaintiff-Appellant,
v.
Salvador MAGLUTA, a/k/a Sal, a/k/a Santiago Menendez, a/k/a
Angelo Maretto, Defendant-Appellee.
 No. 93-5069.
 United States Court of Appeals,
Eleventh Circuit.
 Feb. 21, 1995.
 
 Christopher Clark, Ann Hayes, Linda Collins Hertz, Asst. U.S. Attys., Miami, FL, for appellant.
 Jeffrey S. Weiner, Miami, FL, for Orlando Lorenzo.
 Martin G. Weinberg, Boston, MA, for Salvador Magluta.
 Appeal from the United States District Court for the Southern District of Florida.
 Before KRAVITCH and HATCHETT, Circuit Judges, and CLARK, Senior Circuit Judge.
 KRAVITCH, Circuit Judge:
 
 
 1
 The United States government appeals the district court's order granting Salvador Magluta's motion to suppress evidence obtained by federal and state law enforcement agents after entry into a residence for the purpose of executing outstanding arrest warrants.[1] We REVERSE and REMAND.
 
 
 2
 I. Factual Background and Procedural History
 
 
 3
 In April 1991, a federal grand jury in the Southern District of Florida returned a 24 count indictment charging Salvador Magluta with numerous offenses involving cocaine trafficking, including conspiracy to import cocaine, conspiracy to possess with intent to distribute cocaine, importation of cocaine, and possession with intent to distribute cocaine. Orlando Lorenzo was charged in the conspiracy counts of the indictment.[2] Arrest warrants were issued for Magluta and Lorenzo, and the United States Marshals Service's fugitive apprehension unit was assigned the task of locating Magluta and Lorenzo, as well as other named suspects.[3] Despite extensive investigation, the marshals were unable to locate or apprehend Magluta and Lorenzo until October 13, 1991, when a previously reliable confidential source in custody provided Deputy Marshal Keith Braynon with information regarding the location of Magluta's and Lorenzo's respective residences. The confidential informant ("CI") had obtained this information from Luis Mendez, a co-defendant in the instant case who had been arrested less than a month earlier. The CI gave Braynon a map showing the location of Magluta's residence,[4] and informed Braynon that Lorenzo was Magluta's friend and drug associate, who frequently visited Magluta's house. The CI also reported that there was a smaller residence on the premises occupied by bodyguards, that Lorenzo lived south of Magluta's residence in an apartment building on Miami Beach, and that Mendez had been at the residence within the past month.
 
 
 4
 On October 15, 1991, at about 6 a.m., Braynon went to the location of the house on the map, later identified as 98 East La Gorce Circle (hereinafter "98 East La Gorce"), and verified that the house was lived in. The house is located on a private island, La Gorce Island, the sole entrance to which is monitored by guards who operate an entry gate from a guard shack. Braynon noted that the lawn was manicured and that a porch light was on. A gold Honda car, a large motor home, a white Chevrolet Astro van, and a gray Pathfinder were parked outside of the residence. Later that morning, Braynon returned and the marshals established a surveillance team at the entrance to La Gorce Island. At approximately 12:30 p.m., the gold Honda drove away; the driver, according to Braynon, resembled Lorenzo. When the afternoon guard, Michael Vaccaro, arrived at 3:00 p.m., Braynon showed him photos of Lorenzo and Magluta. According to Braynon, Vaccaro identified Lorenzo as a person who frequented 98 East La Gorce, and although he could not positively identify Magluta, he noted that a man who looked like Magluta lived at 98 East La Gorce and drove a white Chevy Astro van. Contrary to Braynon's recollection, Vaccaro later testified that he had only identified Lorenzo to Braynon, and that he did not provide any information with respect to Magluta, the owner of the Chevy Astro van, or the identity of the resident of 98 East La Gorce.[5] Vaccaro testified that Magluta was not the man that he had seen driving the white Astro van, but rather, he provided a description of the van's driver that did not match Magluta.
 
 
 5
 At approximately 5:00 p.m., the gold Honda returned to the island, and Braynon, who was stationed in the guard's shack, thought he recognized the driver as Lorenzo. Based upon the facts described above, Braynon and his supervisor, Deputy Marshal Sean Conboy, decided that they had sufficient information to conclude that fugitives named in the indictment were present at 98 East La Gorce. Between 5:30 and 6:00 p.m. the agents and local police approached the house in marked Miami Beach police cruisers. Conboy stated that four men were standing in the front porch area of the house, and that upon seeing the police cars approach, two men, including a man matching Lorenzo's description, entered the house. The other two men on the porch immediately surrendered. Over a loudspeaker, Conboy directed everyone to leave the house. Two more men complied, but based upon the statements of detainees who had exited the residence, the marshals believed that at least two suspects remained inside.
 
 
 6
 After several minutes, a six person special operations group (SOG) team,[6] led by Inspector Michael Cameron, sprayed an irritant gas, similar to tear gas, into the house. A minute later the team entered and performed a protective sweep of the house, which lasted five to seven minutes. During the sweep, the team located Lorenzo, who was suffering from effects of the gas, and escorted him from the house. Also during the sweep, marshals observed in plain view two nylon gym bags, numerous papers, telephones, a telefax machine and a floor safe. A detainee told Conboy that another man remained in the house, and an agent then observed that a person might have jumped from a second story window. A search of the bushes surrounding the house, with the assistance of a Miami Beach police dog, resulted in Magluta's capture.
 
 
 7
 Simultaneously with the search of the main house, Miami police secured the guest house and executed a protective sweep of that structure as well. During the sweep, police discovered a box containing stacks of currency.[7] No further search occurred until Special Agent David Borah of the Drug Enforcement Agency obtained a search warrant. The search executed pursuant to the warrant located fax machines, large assortments of jewelry and U.S. currency, a suitcase with ledgers, portable phones, beepers and an electronic rolodex.
 
 
 8
 Magluta and Lorenzo moved to suppress the evidence seized during the above-described searches. After an evidentiary hearing, the magistrate judge issued a report and recommendation in which he found that there was probable cause to believe that Magluta resided at 98 East La Gorce,[8] but that the marshals did not have probable cause or reason to believe Magluta was at the residence at the time the search took place. The magistrate judge concluded that there was no evidence that Magluta was at the property on the day of the search, or anytime within the previous month. He opined that Lorenzo's presence was not dispositive as to Magluta's presence, and the fact that Magluta might have been connected to the Astro van was of "little import since no one had seen Magluta in the house for at least one month," and there was no evidence as to when Magluta last drove the vehicle. The magistrate judge also concluded that neither the inevitable discovery nor independent source exceptions applied in this case. Accordingly, he recommended that the motion to suppress be granted. The district court accepted the magistrate judge's report and recommendation in its entirety, and granted Magluta and Lorenzo's joint motion to suppress. This appeal followed.
 
 II.
 
 9
 The Supreme Court set the standard for entry into residences based upon an arrest warrant in Payton v. New York, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), where the Court stated: "[F]or Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." Id. at 603, 100 S.Ct. at 1388 (emphasis added). Payton thus requires a two-part inquiry: first, there must be a reasonable belief that the location to be searched is the suspect's dwelling, and second, the police must have "reason to believe" that the suspect is within the dwelling. In this case, police had a valid arrest warrant for Magluta, and thus were privileged to enter 98 East La Gorce if they had reason to believe it was Magluta's residence, and if they had reason to believe that Magluta was home at the time of entry. As noted above, although the magistrate judge found that the government had sufficient information to believe that Magluta resided at 98 East La Gorce, he held that the evidence was insufficient to establish that Magluta was at home at the time of the entry. Therefore, he granted the motion to suppress.[9]
 
 
 10
 The parties disagree as to the meaning of Payton 's "reason to believe" test. Magluta argues that the Payton standard is the functional equivalent of probable cause; the government contends that the standard embodies a lesser degree of certainty than probable cause.
 
 
 11
 The "reason to believe" standard was not defined in Payton, and since Payton, neither the Supreme Court, nor the courts of appeals have provided much illumination. See, e.g., United States v. De Parias, 805 F.2d 1447, 1457 (11th Cir.1986) (applying Payton without defining "reason to believe"), cert. denied, 482 U.S. 916, 107 S.Ct. 3189, 96 L.Ed.2d 678 (1987). Consequently, the parties have been forced to assert somewhat strained rationales for their respective interpretations. Magluta notes that it was not argued in Payton that the police lacked probable cause to believe the suspect was home, Payton, 445 U.S. at 582-83, 100 S.Ct. at 1378; and that the dissent in Payton treated the majority opinion as if it required a showing of probable cause that the suspect was at home. See Payton, 445 U.S. at 580-81 n. 13, 100 S.Ct. at 1395 n. 13 (White, J., dissenting). He also directs our attention to the Supreme Court's language in Maryland v. Buie, 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990), in which the Court addressed the permissible scope of a protective sweep incident to arrest. In Buie, the Court explained that "[p]ossessing an arrest warrant and probable cause to believe he was in his home, the officers were entitled to enter and to search anywhere in the house in which Buie might be found." Id. at 332-33, 110 S.Ct. at 1097 (emphasis added).
 
 
 12
 Nevertheless, the Court's language in Buie is not dispositive, because the Court there merely reasoned that based on the facts of Buie the police officers' possession of probable cause entitled them to enter and sweep the residence--the Court did not and has not, ever held that probable cause is required to enter a residence to execute an arrest warrant for the resident.
 
 
 13
 On the other hand, the government has failed to cite a single case in which the Payton standard has been defined as embodying less than probable cause. In fact, at oral argument, government's counsel even referred to the applicable standard as "quasi-probable cause." The strongest support for a lesser burden than probable cause remains the text of Payton, and what we must assume was a conscious effort on the part of the Supreme Court in choosing the verbal formulation of "reason to believe" over that of "probable cause." Cf. 2 Wayne R. LaFave, Search and Seizure Sec. 6.1(a) at 565, 567 (1987) (opining that standard may have been enunciated as it was in Payton "so as not to encourage lower courts to adopt a hard-nosed 'probable cause to believe the suspect is at home' test," but still arguing that "on balance it seems preferable to insist upon probable cause").
 
 
 14
 Prior to Payton, this circuit's predecessor recognized the right to enter a residence to execute an arrest warrant. See United States v. Woods, 560 F.2d 660, 665 (5th Cir.1977) (collecting cases), cert. denied, 435 U.S. 906, 98 S.Ct. 1452, 55 L.Ed.2d 497 (1978). Like the Payton court, the former Fifth Circuit permitted such entry upon reasonable belief. As the Woods court summarized:
 
 
 15
 The test is properly framed in terms of reasonable belief. Probable cause is essentially a concept of reasonableness, but it has become a term of art in that it must always be determined by a magistrate unless exigent circumstances excuse a warrant.... Reasonable belief embodies the same standards of reasonableness but allows the officer, who has already been to the magistrate to secure an arrest warrant, to determine that the suspect is probably within certain premises without an additional trip to the magistrate.
 
 
 16
 Id. (quoting United States v. Cravero, 545 F.2d 406, 421 (5th Cir.1976)).[10] Hence, we must view the evidence in this case in light of the recognition that probable cause itself is a doctrine of reasonable probability and not certainty. See Hill v. California, 401 U.S. 797, 804, 91 S.Ct. 1106, 1110-11, 28 L.Ed.2d 484 (1971) ("[S]ufficient probability, not certainty, is the touchstone of reasonableness under the Fourth Amendment...."); see also United States v. Allison, 953 F.2d 1346, 1350 (11th Cir.1992) ("Probable cause exists where the facts and circumstances within an officer's knowledge and of which he had reasonably trustworthy information are sufficient to warrant a person of reasonable belief that an offense has been or is being committed by the person to be arrested."); United States v. Gonzalez, 969 F.2d 999, 1002-03 (11th Cir.1992) (employing similar definition of probable cause, and noting that observations and experiences of law enforcement agents may be weighed in the totality of circumstances that might create probable cause for an arrest).
 
 
 17
 Due to the lack of authority on point, it is difficult to define the Payton "reason to believe" standard, or to compare the quantum of proof the standard requires with the proof that probable cause requires. We think it sufficient to hold that in order for law enforcement officials to enter a residence to execute an arrest warrant for a resident of the premises, the facts and circumstances within the knowledge of the law enforcement agents, when viewed in the totality, must warrant a reasonable belief that the location to be searched is the suspect's dwelling, and that the suspect is within the residence at the time of entry. The magistrate judge held, and we agree, that the evidence supported the marshals' reasonable belief that 98 East La Gorce was Magluta's residence. In evaluating this on the spot determination, as to the second Payton prong, courts must be sensitive to common sense factors indicating a resident's presence. For example, officers may take into consideration the possibility that the resident may be aware that police are attempting to ascertain whether or not the resident is at home,[11] and officers may presume that a person is at home at certain times of the day--a presumption which can be rebutted by contrary evidence regarding the suspect's known schedule.
 
 
 18
 This circuit's case law supports this practical interpretation of Payton. In United States v. Beck, 729 F.2d 1329, 1331-32 (11th Cir.), cert. denied, 469 U.S. 981, 105 S.Ct. 383, 83 L.Ed.2d 318 (1984), this court held that FBI officers and local police had reason to believe that Beck was in his apartment when the officers entered it to execute an arrest warrant. In Beck, there were no outward signs of life in the apartment the evening before the search or the next morning, and as the agents had not monitored Beck's apartment, they were not aware of his comings and goings. Despite these evidentiary shortcomings, the Beck court observed that Beck's car was parked near the home, and that it was reasonable to believe that a person would be home sleeping at 7:30 a.m., which would account for the lack of outward signs of life. Finally, the court noted that the lack of response to the officer's knock and announcement did not indicate that no one was at home "since it was reasonable to expect a fugitive to hide or flee if possible." Id. at 1332; see also De Parias, 805 F.2d at 1457 (holding that the district court did not clearly err by determining that agents reasonably believed that the suspects were at home, where the apartment manager informed agents that the De Pariases were at home if a certain car was parked in front of the apartment).
 
 
 19
 The former Fifth Circuit applied similar reasoning in Woods:
 
 
 20
 Although there is no indication in the record that the officers had reason to know whether appellant would be at his home when they went there to execute the arrest warrant, we find it reasonable anticipation on the officers' part to believe that a person would be at his place of abode, especially at 8:30 in the morning for a man not known to be working....
 
 
 21
 Woods, 560 F.2d at 665. Other courts similarly have employed a common sense approach to reviewing these determinations. See, e.g., United States v. Terry, 702 F.2d 299, 319 (2d Cir.) (sufficient evidence to believe Terry was at the residence where a 12 year old boy outside of the residence, wearing a shirt with the name "Terry" on it, stated that his father and mother lived at the residence and did not indicate that his father was not at home, and further, at 8:45 a.m. on a Sunday morning it would be reasonable to assume Terry was at home), cert. denied, 461 U.S. 931, 103 S.Ct. 2095, 77 L.Ed.2d 304 (1983) and 464 U.S. 992, 104 S.Ct. 482, 78 L.Ed.2d 680 (1983); United States v. Litteral, 910 F.2d 547, 553-54 (9th Cir.1990) (belief reasonable when informant told agents that if Litteral's car was at the property, he would be there); United States v. Morehead, 959 F.2d 1489, 1496 (10th Cir.1992) (officers knew that the person resided at the house, and the presence of a car in the carport and a truck in front of the house provided reason to believe that he was on the premises), reh'g en banc sub nom., United States v. Hill, 971 F.2d 1461 (10th Cir.1992) (en banc) (affirmed on other grounds).
 
 III.
 
 22
 Having set forth the appropriate inquiry under Payton, we must determine the proper standard of review. The parties dispute the level of deference this court should accord the magistrate judge's determination that the police lacked a sufficient basis for concluding that Magluta was at home at the time of the entry in 98 East La Gorce.[12]
 
 
 23
 Because rulings on motions to suppress involve mixed questions of fact and law, we review the district court's factual findings for clear error, and its application of the law to the facts de novo. United States v. Ramos, 12 F.3d 1019, 1022 (11th Cir.1994); United States v. Diaz-Lizaraza, 981 F.2d 1216, 1220 (11th Cir.1993). Further, when considering a ruling on a motion to suppress, all facts are construed in the light most favorable to the prevailing party below. United States v. Behety, 32 F.3d 503, 510 (11th Cir.1994).
 
 
 24
 The mere incantation of this oft-repeated standard does not end our inquiry; we must decide whether the magistrate judge's holding that the police did not have reason to believe that Magluta was home at the time of the marshals' entry should be treated as a factual finding reviewed for clear error, as Magluta urges, or as a legal conclusion reviewed de novo, as the government requests. In framing this inquiry, we note that the magistrate judge did not conclude that these particular U.S. marshals did not believe that Magluta was home; such a conclusion would clearly involve evaluating the reliability of the marshals' testimony to determine whether they did indeed possess such a subjective belief. Rather, the magistrate judge weighed the factual evidence and engaged in an objective inquiry as to whether the facts at the time of the entry should have given the marshals "reason to believe" that Magluta was at home.
 
 
 25
 In United States v. Tobin, 923 F.2d 1506 (11th Cir.) (en banc), cert. denied, 502 U.S. 907, 112 S.Ct. 299, 116 L.Ed.2d 243 (1991), this court addressed the warrantless search of a residence based upon a combination of probable cause and exigent circumstances. Like the execution of the arrest warrant here, the probable cause determination in cases such as Tobin is made, in the first instance, by the police officers on the scene, not by a neutral and detached magistrate. In Tobin, the court unequivocally stated: "The question of what amounts to 'probable cause is purely a question of law and is subject to plenary review by this court.' " Id. at 1510 (quoting United States v. Hurtado, 779 F.2d 1467, 1477 (11th Cir.1985)); see also Allison, 953 F.2d at 1349-51 (reviewing de novo DEA agents' determination that they possessed probable cause to arrest suspect). Tobin thus removed any doubt as to the standard of review for an officer's probable cause determination.[13] We can divine no rational reason for applying a different standard of review for the probable cause determinations officers made on the scene in Tobin and Allison, and the determination the law enforcement agents made on the scene in this case. We therefore hold that the magistrate judge's conclusion that the marshals did not have reason to believe that Magluta was at home, was a legal determination and not a factual finding.[14] Thus, we will review de novo the magistrate judge's holding, adopted in full by the district court, that the police did not have reason to believe that Magluta was at home at the time of the entry.[15] See Cumbie v. Singletary, 991 F.2d 715, 719 (11th Cir.), cert. denied, --- U.S. ----, 114 S.Ct. 650, 126 L.Ed.2d 608 (1993) (magistrate judge's conclusions of law as adopted by district court reviewed de novo ).
 
 IV.
 
 26
 The evidence before the magistrate judge included Braynon's testimony that: (1) information from Luis Mendez, a co-defendant in the instant case, via a confidential informant, described Lorenzo as Magluta's friend and drug associate, and as a frequent visitor to the residence; (2) the afternoon guard identified Lorenzo as a person who frequented the residence; (3) during his early morning drive-through, Braynon saw a gold Honda, a white Astro van, and other vehicles parked outside of the residence; (4) the lawn was manicured and a porch light was on when he drove by; and (5) the afternoon guard said that a photograph of Magluta resembled the home renter and that the person who resembled the man in the photo drove a white Astro van. There was also evidence that: the white Astro van did not depart during the entire day; the gold Honda left the island at approximately 12:30 p.m. with a driver resembling Lorenzo, and returned at approximately 5:30 p.m., driven by a man positively identified as Lorenzo; and the Honda was then seen parked at 98 East La Gorce.
 
 
 27
 The most important dispute in the evidence arises from the testimony of Vaccaro, the afternoon guard, that he did not identify the photograph of Magluta as being the resident of the premises, and that he did not relate to Braynon any connection between the white Astro van and Magluta. To the contrary, Vaccaro described the driver of the white van and testified that Magluta did not resemble the driver.[16]
 
 
 28
 A review of the evidence available to the marshals at the time of the entry into 98 East La Gorce, viewed in the totality of the circumstances, leads us to conclude that the facts supported the marshals' reasonable belief that Magluta was at home at the time of the entry--despite possible inferences to the contrary.[17]
 
 
 29
 First, it is uncontroverted that Lorenzo was a frequent visitor to the residence, and there is no doubt that Lorenzo was at the home at the time of entry; he was positively identified returning to the island, and his vehicle was spotted outside of the residence. Moreover, the magistrate judge held that the evidence supported the conclusion that Magluta resided at 98 East La Gorce. It is reasonable and logical for the marshals to have inferred that Lorenzo was at 98 East La Gorce visiting the resident of the premises, Magluta--especially as the two men were friends and associates. The presence of a visitor at a residence supports the reasonable conclusion that the resident is at home.
 
 
 30
 Other evidence involves the connection of Magluta to the white Chevrolet Astro van. The presence of a vehicle connected to a suspect is sufficient to create the inference that the suspect is at home. See Beck, 729 F.2d at 1331-32; De Parias, 805 F.2d at 1457; Litteral, 910 F.2d at 553-54. It is undisputed that the van did not depart from the premises during the entire period of surveillance. Because the magistrate judge did not discredit Braynon's testimony connecting the van to Magluta, the presence of the van contributes to the reasonableness of the marshals' belief that Magluta was at home.
 
 
 31
 There was also evidence that the residence was lived in: the lawn was manicured and a porch light was on during Braynon's drive-through. While this in and of itself would not demonstrate that Magluta was at home at the time of entry, it is fair to consider this fact, as there was no indication that Magluta departed, such as for work or the like.
 
 
 32
 Finally, the officers were entitled to consider that Magluta was a fugitive from justice, wanted on a 24 count drug trafficking indictment, who might have been concealing his presence. This could explain why the marshals never saw Magluta during their observation, and why he might not have been spotted previously. Hence, the lack of direct evidence that Magluta had been seen that day does not eviscerate the marshals' reasonable conclusion that he was at home.
 
 
 33
 Neither Payton nor this court's Fourth Amendment jurisprudence requires law enforcement officers to be absolutely certain that a suspect is at home before entering a residence to execute an arrest warrant. Accordingly, we hold that the evidence available to the marshals at the time they entered the residence to execute the arrest warrants reasonably supported the conclusion that Magluta was at home at that time.
 
 
 34
 Once the marshals possessed this valid justification to enter the residence they were entitled, pursuant to Maryland v. Buie, 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990), to engage in a protective sweep of the premises. Any evidence discovered in plain view during the sweep was properly used to secure a search warrant for the premises. Cf. Tobin, 923 F.2d at 1513 (evidence seen during protective sweep may be seized).
 
 
 35
 Based upon the foregoing discussion, we REVERSE the district court's order granting Magluta's motion to suppress and REMAND for proceedings consistent with this opinion.[18]
 
 
 36
 REVERSED and REMANDED.
 
 
 
 [1]
 The government brings this interlocutory appeal pursuant to 18 U.S.C. Sec. 3731. The district court granted a joint motion to suppress in favor of Salvador Magluta and his co-defendant, Orlando Lorenzo. Although the government initially appealed the grant of this motion as to both Lorenzo and Magluta, since the appeal was filed, Lorenzo entered into a guilty plea and the government dismissed its appeal as to him. Accordingly, we need not decide whether the motion to suppress was properly granted in Lorenzo's favor
 
 
 [2]
 Eight other individuals were also named in the indictment
 
 
 [3]
 During the previous year, marshals had sought Magluta and another co-defendant, Augusto Falcon, on outstanding arrest warrants from several jurisdictions. Testimony before the magistrate judge showed that Magluta was arrested by local law enforcement officers in 1988, pursuant to state warrants, but that he had disappeared from the Dade County Jail under unexplained circumstances
 
 
 [4]
 The map was not available at the time of the suppression hearing, and it does not appear that it was ever produced to the defendants
 
 
 [5]
 Michael Lamonico, the morning guard, testified that he did not provide the agents with any information regarding the occupants of the residence or any vehicles connected to those residents. He did testify, though, that he had identified a picture of Lorenzo for the marshals. Braynon's supervisor, Deputy Marshal Sean Conboy did not recall that the morning guard identified Lorenzo as a frequent visitor
 
 
 [6]
 SOG teams are the Marshals Service's equivalent of a SWAT team
 
 
 [7]
 Miami police had to remove a deadbolted closet door and look under a suspiciously raised rug in the closet to find the box of currency
 
 
 [8]
 The magistrate judge based this holding upon the information supplied to the marshals by Mendez via the map, the identification of Lorenzo at 98 East La Gorce, and Braynon's testimony regarding the afternoon guard's tentative identification of Magluta
 
 
 [9]
 The magistrate judge thus bypassed defining the Payton standard by holding that there was a sufficient quantum of evidence that 98 East La Gorce was Magluta's residence to satisfy both a probable cause and a lesser "reason to believe" standard, but that there was insufficient evidence to support the conclusion that Magluta was at home under either standard
 
 
 [10]
 Decisions of the former Fifth Circuit rendered prior to October 1, 1981, are circuit precedent in the Eleventh Circuit. Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc)
 
 
 [11]
 Although LaFave argues in favor of the probable cause standard, he contends that this standard should be applied with common sense, so that "the police need not possess 'special knowledge' that the defendant is at home in order to meet the probable cause test, for in the absence of facts tending to show that the defendant is not at home it is reasonable to infer that he would be there.... [I]f the defendant's quarters are dark and no sounds or movements can be detected within and no one answers the door, the other facts and circumstances (e.g. nature of the crime, crime recently committed, defendant's car parked nearby) may nonetheless support the inference that the defendant is concealing himself therein." See 2 Wayne R. LaFave, Search and Seizure Sec. 6.1(a) at 568 (1987)
 
 
 [12]
 As explained above, the magistrate judge's report and recommendation was "ratified, affirmed and approved in its entirety" by the district court
 
 
 [13]
 Magluta directs our attention to United States v. Edmondson, 791 F.2d 1512, 1515 (11th Cir.1986), in which a panel of this court applied the clearly erroneous standard of review to a district court's finding that FBI agents possessed probable cause for arresting a suspect. However, it is unlikely that the Edmondson court's application of the clearly erroneous standard survives Tobin
 
 
 [14]
 There are cases involving motions to suppress that turn on the resolution of narrow disputed factual findings, which are properly reviewed for clear error. See, e.g., United States v. Cure, 996 F.2d 1136, 1137-38 (11th Cir.1993) (stop of car not pretextual due to factual finding that officer stopped vehicle because it was driving without headlights), cert. denied, --- U.S. ----, 114 S.Ct. 1075, 127 L.Ed.2d 393 (1994). In our view, this case does not present such a situation
 
 
 [15]
 In De Parias, 805 F.2d at 1457, this court reviewed the district court's determination that police had reason to believe the suspect was at home under the clearly erroneous standard; the De Parias court, however, did not elaborate on why it felt that the clear error standard was appropriate in that case. In light of Tobin, which was decided en banc, subsequent to De Parias, we feel compelled to apply a different standard of review than the De Parias panel
 
 
 [16]
 The government argues that the magistrate judge's finding that there was probable cause to believe that Magluta resided in the house, based in part on Braynon's testimony, represents an implicit determination by the magistrate judge that Braynon was more credible than the guard. Although credibility determinations are for the factfinder and should not be tampered with on appeal, see United States v. Copeland, 20 F.3d 412, 413 (11th Cir.1994), the fact that the magistrate judge relied on Braynon's testimony to the extent that it supported the notion that Magluta resided at 98 East La Gorce, does not, without more, indicate that the magistrate judge fully discredited the afternoon guard's testimony. Accordingly, Braynon's testimony must be weighed in the Payton analysis, taking this dispute into consideration
 
 
 [17]
 For example, Magluta asserts that the time of day the entry occurred, around 6:00 p.m., does not readily support the conclusion that Magluta was at home, as it did in Beck, Terry and Woods, which involved early morning raids; the actual source of information in this case was Mendez, a man who was not known to be reliable; little information was given about Magluta's current comings and goings; Braynon's drive-through only proved that someone lived at the residence; and ownership of the vehicles was not ascertained. Also, evidence was presented that the morning guard did not recognize Magluta's photo at all, neither guard was asked when Magluta was last seen, and even by Braynon's own testimony, the afternoon guard only saw a resemblance between the photo and the occupant of 98 East La Gorce
 
 
 [18]
 Because we reverse the district court's grant of the motion to suppress on the grounds discussed above, it is unnecessary for us to determine whether the district court erred by precluding the government from presenting evidence related to the applicability of the inevitable discovery and independent source doctrines, and by holding that these exceptions do not apply to this case