**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**APR 5 1999**

**PATRICK FISHER**
**Clerk**

PUBLISH

## UNITED STATES COURT OF APPEALS

## FOR THE TENTH CIRCUIT

_____

ROSANNA VALDEZ,

        Plaintiff-Appellant,

v.                                                          No. 97-4057

SAMUEL McPHETERS, an agent of the
Federal Bureau of Investigation, and
GREG LITTLEWHITEMAN, an officer of
the Bureau of Indian Affairs,

        Defendants-Appellees.

_____

**Appeal from the United States District Court**
**for the District of Utah**
**(D.C. No. 94-C-523J)**

_____

Stephen C. Clark (Pamela Martinson on the brief) of American Civil Liberties Union of
Utah Foundation, Inc., Salt Lake City, Utah, for Plaintiff-Appellant.

Paul Michael Brown, Torts Branch, Civil Division, Washington, D.C., (Barbara L.
Herwig, Appellate Staff, Civil Division, Washington, D.C., with him on the brief) for
Defendants-Appellees.

_____

Before **EBEL** and **BRISCOE**, Circuit Judges, and **MARTEN**,[*] District Judge.

_____

**MARTEN**, District Judge.

_____

On December 7, 1993, FBI Special Agent Samuel Michael McPheters and Bureau of Indian Affairs ("BIA") Police Officer Gregory Littlewhiteman arrived at the plaintiff Rosanna Valdez's residence in LaPoint, Utah. The officers told the plaintiff that there was an outstanding felony warrant for the arrest of her son, Raymond Nathaniel Valdez. McPheters told the plaintiff they would like to come inside to see if her son was present.

There is a dispute as to whether the plaintiff consented to the officers' entry. According to the officers, the plaintiff told them to "go ahead." The plaintiff states that she told the officers they could not search for her son without a search warrant.

Special Agent McPheters looked through the residence while Officer Littlewhiteman remained with several other persons in the living room area. When they were unable to find Raymond Valdez, the officers left the residence and continued their investigation. They spoke with Sherman Dubois, who told the officers that he had seen Raymond Valdez at the residence earlier in the day. The officers then returned to the Valdez residence, but were again unable to find Raymond.

_____

[*] Honorable J. Thomas Marten, District Court Judge, District of Kansas, sitting by designation.

On December 27, Raymond Valdez surrendered to authorities and was placed in the Uintah County jail.

Plaintiff Rosanna Valdez subsequently instituted the present action, alleging the defendants McPheters and Littlewhiteman violated her constitutional rights against unreasonable search and seizure. On March 14, 1996, the District Court granted the defendants' Motion for Summary Judgment. This appeal followed.

Special Agent Samuel Michael McPheters has worked for the FBI for 27 years. At the time of the events giving rise to this litigation, he served as Resident Agent in Charge of the FBI's Vernal, Utah office. Officer Gregory Littlewhiteman is a BIA Police Officer assigned to the Uintah and Ouray Agency, headquartered at Ft. Duchesne, Utah. Littlewhiteman is an enrolled member of the Oglala Sioux tribe. As a result of his job and participation in community outreach activities, Littlewhiteman has become personally acquainted with many of the people who live on or around the Uintah-Ouray reservation.

In November of 1993, the Salt Lake City Police Department obtained an arrest warrant for Raymond Nathaniel Valdez. Valdez was charged by information with one count of burglary (a second degree felony), and one count of theft (a third degree felony). The Salt Lake City police requested assistance from the FBI in apprehending Valdez, advising the agency that "VALDEZ comes into the city on weekends, does a burglary or two then goes back to the Indian Reservation at LaPoint, Utah. VALDEZ's mother,

ROSANNE VALDEZ, lives at LaPoint." The police also provided the agency with the telephone number for the Valdez residence. (R. 8, at 1).

Rosanna Valdez, the plaintiff, lives in Uintah County, near the town of LaPoint, Utah, with her husband Raymond Valdez, Sr., and several other family members. The residence has a telephone, the number matching that given by the Salt Lake City police to the FBI. An attorney fact sheet filed with the warrant lists Raymond, Jr.'s physical characteristics and denominates his address as "transient." (R. 7).

The FBI's Fugitive Task Force notified Special Agent McPheters of the state arrest warrant for Raymond Valdez on December 7, 1993. McPheters drove to the BIA police headquarters in Ft. Duchesne, where he asked Lt. Ed Reynolds about Valdez's whereabouts. Reynolds told McPheters that Valdez was living at the Valdez residence in LaPoint. Reynolds assigned Officer Littlewhiteman to assist in finding Valdez.

Littlewhiteman told McPheters that Valdez was living at the Valdez residence in LaPoint. Littlewhiteman based this conclusion on information he had gathered during his police duties. This information included the following:

1) On September 27, 1993, while being booked on a drug charge, Valdez stated in Littlewhiteman's presence that he lived with his mother in LaPoint.

2) Littlewhiteman knows Valerie Tom, who is a friend, neighbor and relative of his wife. In the fall of 1993, Tom was married to Odorico Palesides. Littlewhiteman had twice arrested Palesides on spouse abuse charges during this time period. During the

course of making these arrests, Littlewhiteman learned that Palesides was an associate of Raymond Valdez. He also knew by sight Tom's Toyota pickup truck. Tom told Littlewhiteman that Palesides used the pickup truck to drive to the Valdez residence to meet Raymond Valdez, and that the two would go out drinking. This information corresponded with Littlewhiteman's observations during his routine patrols, having seen the pickup truck on several occasions at the Valdez residence during October and November.

3) On December 3, 1993, Roosevelt City Police Officer Steve Hooley told Littlewhiteman that Raymond Valdez was living at the Valdez residence in LaPoint.

4) On December 4, 1993, Littlewhiteman investigated a single-vehicle accident about a quarter mile from the Valdez residence. He recognized the vehicle as Valerie Tom's Toyota truck. The vehicle was abandoned, but two star-shaped imprints on the windshield indicated that a driver and a passenger had been in the truck at the time of the accident. Footprints led from the vehicle in the direction of the Valdez residence.

There is a dispute about what one of the neighbors told Littlewhiteman in connection with the accident. According to Littlewhiteman, Bonnie Hackford Murphy told him she had seen the truck at the Valdez residence earlier in the day, driven by a Mexican male, and that she had previously seen this person in the company of Raymond Valdez. The plaintiff has submitted an affidavit from Murphy denying she made these comments to Littlewhiteman. It is undisputed, however, that the accident occurred in

close proximity to the Valdez residence, and that Littlewhiteman knew the vehicle was used by a friend of the suspect under investigation.

5) It is uncontroverted that Littlewhiteman knew that Raymond Valdez was unemployed, that he liked to stay out late at night drinking, that he sometimes abused drugs including heroin and cocaine, and that he was suspected of several nighttime burglaries. From the knowledge of his lifestyle gained during the course of his normal law enforcement duties, Littlewhiteman believed that Valdez would be at the Valdez residence about noon on December 7, 1993.

The district court granted the defendants' summary judgment motion, finding under Payton v. New York, 445 U.S. 573, 603, 100 S.Ct. 1371, 1388, 63 L.Ed.2d 639 (1980) and Steagald v. United States, 451 U.S. 204, 214 n. 7, 101 S.Ct. 1642, 1649 n. 7, 68 L.Ed.2d 38 (1981), the legality of the defendants' entry into the Valdez residence was governed by the "reasonable belief of an officer, qualified immunity as to whether a person is in a residence at a place and present there." (R. 5, Tr. at 42). The court then concluded that there were "sufficient grounds upon which a reasonable officer could form that belief [and] therefore qualified immunity does apply." Id. at 42-43.

In the present appeal, Valdez contends that the defendants' entry into her residence violated her rights protected under the Fourth Amendment. A person's expectation of privacy in her residence "is plainly one that society is prepared to recognize as justifiable." United States v. Karo, 468 U.S. 705, 714, 104 S.Ct. 3296, 3303, 82 L.Ed.2d

530 (1984). "At the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." Silverman v. United States, 365 U.S. 505, 511, 81 S.Ct. 679, 683, 5 L.Ed.2d 734 (1961). In order to protect this important interest, the Supreme Court has emphasized that the Fourth Amendment draws "a firm line at the entrance to the house," prohibiting a warrantless entry except in limited circumstances. Payton, 445 U.S. at 590, 100 S.Ct. at 1382.

One of the circumstances which may permit an entry into a residence without a search warrant is the existence of a valid arrest warrant for a suspect who is believed to live in the residence. This is because "an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." Payton, 445 U.S. at 603, 100 S.Ct. at 1388. "Because an arrest warrant authorizes the police to deprive a person of his liberty, it necessarily also authorizes a limited invasion of that person's privacy interest when it is necessary to arrest him in his home. " Steagald, 451 U.S. at 214 n. 7. 101 S.Ct. at 1649 n. 7. Absent exigent circumstances, however, an arrest warrant by itself does not authorize entry into the home of a third party. Id., at 215.

The majority of circuits which have addressed the issue have agreed that, under Payton, police officers entering a residence pursuant to an arrest warrant must demonstrate a reasonable belief that the arrestee lived in the residence, and a reasonable

belief that the arrestee could be found within the residence at the time of the entry. See United States v. Route, 104 F.3d 59, 62 (5th Cir.) ("A valid arrest warrant carries with it the implicit but limited authority to enter the residence of the person named in the warrant in order to execute the warrant, where there is 'reason to believe' that the suspect is within"), cert. denied, --- U.S. ----, 117 S.Ct. 2491, 138 L.Ed.2d 998 (1997); United States v. Risse, 83 F.3d 212, 216 (8th Cir.1996) ("officers executing an arrest warrant must have a 'reasonable belief that the suspect resides at the place to be entered ... and [have] reason to believe that the suspect is present' at the time the warrant is executed"); United States v. Lauter, 57 F.3d 212, 215 (2nd Cir.1995) ("the proper inquiry is whether there is a reasonable belief that the suspect resides at the place to be entered ... and whether the officers have reason to believe that the suspect is present"); United States v. Edmonds, 52 F.3d 1236, 1248 (3d Cir.1995) (although "the information available to the agents clearly did not exclude the possibility that [the suspect] was not in the apartment, the agents had reasonable grounds for concluding that he was there"), vacated in part on other grounds, 52 F.3d 1236, 1251 (3d Cir.1995), cert. denied _ U.S. _ 117 S.Ct. 295, 136 L.Ed.2d 214 (1996); United States v. Magluta, 44 F.3d 1530, 1535 (11th Cir.) ("the facts and circumstances within the knowledge of the law enforcement agents, when viewed in the totality, must warrant a reasonable belief that the location to be searched is the suspect's dwelling, and that the suspect is within the residence at the time of entry"), cert. denied, --- U.S. ----, 116 S.Ct. 189, 133 L.Ed.2d 126 (1995). This court has

recently agreed in an unpublished decision, <u>Anderson v. Campbell</u>, 1996 WL 731244 (10th Cir. 1996).

Only one circuit has suggested a higher knowledge standard on the part of law enforcement officers. In <u>United States v. Harper</u>, 928 F.2d 894 (9th Cir. 1991), the Ninth Circuit concluded that "the police may enter a home with an arrest warrant only if they have probable cause to believe the person named in the warrant resides there." The court provided no rationale for adopting this standard, merely citing its prior decision in <u>Perez v. Simmons</u>, 900 F.2d 213 (9th Cir. 1990), <u>amending</u> 884 F.2d 1136 (9th Cir. 1989).[1]

---

[1] <u>Perez</u>, however, does not directly support a determination that "probable cause" rather than "reasonable grounds" is the appropriate standard. In its initial opinion, the court in <u>Perez</u> was concerned by evidence that suggested the person named in the warrant, the plaintiff's brother, was at most a temporary guest in his sister's searched apartment, and at most "may have occasionally spent the night there." 884 F.2d at 1141. The Perez court initially wrote that "if Albert did not actually reside in the apartment, the search was illegal under <u>Steagald</u>." 884 F.2d at 1140. After the government's petition for rehearing, the court modified this standard, adding the emphasized language

> if <u>the officers did not have reasonable grounds for believing that</u> Albert resided in the apartment, the search was illegal under <u>Steagald</u>.

900 F.2d at 213, <u>typographical error corrected</u>, 998 F.2d 775 (emphasis added).

> Similarly, the court initially wrote:
> Unless a jury finds that Albert was an actual co-resident of the apartment, and that the police had reasonable grounds for believing that Albert was in the apartment at the time, the search was in violation of Irma Perez's constitutional rights.

884 F.2d at 1142 (citation omitted). This was subsequently modified to:

> Unless a jury finds that <u>the officers had reasonable grounds for believing</u> that Albert was a co-resident of the apartment, and for believing that Albert was in the apartment at the time, <u>see</u> <u>Payton</u>, 445 U.S. at 603 100 S.Ct5. at 1388, the search was in violation of Irma Perez's constitutional rights.
> 900 F.2d at 213 (emphasis added).
> The actual status of law in the Ninth Circuit is open to question. In <u>United States v.</u>

This court finds the defendants were entitled to enter the Valdez residence if there was a reasonable basis for believing that Raymond Valdez, Jr. both (1) lived in the residence and (2) could be found within at the time of entry. As to the level of knowledge required by the officers, the Supreme Court in Payton explicitly indicated that entry is permissible so long as there is "reason to believe the suspect is within." 445 U.S. at 603. There is no substantial reason to believe that the standard of knowledge should be different or greater when it comes to the other prong of the Payton test, whether the suspect resides at the house. It would be curious indeed if the two prongs of the test were governed by two different standards of proof.

More importantly, requiring actual knowledge of the suspect's true residence would effectively make Payton a dead letter. In the real world, people do not live in individual, separate, hermetically-sealed residences. They live with other people, they move from one residence to another. Requiring that the suspect actually reside at the residence entered would mean that officers could never rely on Payton, since they could never be certain that the suspect had not moved out the previous day and that a Bivens or a 42 USC§1983 claim would then be made against them by another resident. The better rule is that both prongs of the Payton test are governed by the same test — reasonable

_____

Albrektsen, 151 F.3d 951 (9th Cir. 1998) the court recently cited with approval both Route and Risse for the proposition that officers executing an arrest warrant must have "some reason to believe that the defendant might live at and be present within the premises" entered. The court makes no mention of the existence of any higher standard of knowledge.

-10-

belief on the part of the officers. The officers' belief need not prove true in fact, it is sufficient if the belief was objectively reasonable at the time of entry. United States v. Risse, 83 F.3d 212, 216 (8th Cir.1996). See Anderson, 1996 WL 731244 at **2 ("the officers' belief that Steven was residing at home, while perhaps not correct, was reasonable").

Payton and Steagald cannot be understood to divide the world into residences belonging solely to the suspect on the one hand, and third parties on the other. The rule announced in Payton is applicable so long as the suspect "possesses common authority over, or some other significant relationship to," the residence entered by police. Risse, 83 F.3d at 217. Thus, entry into a residence pursuant to an arrest warrant is permitted when "the facts and circumstances within the knowledge of the law enforcement agents, when viewed in the totality, must warrant a reasonable belief that the location to be searched is the suspect's dwelling, and that the suspect is within the residence at the time of entry." Magluta, 44 F.3d at 1535.

Turning to the second prong of the Payton test, courts "must be sensitive to common sense factors indicating a resident's presence." Direct surveillance or the actual viewing of the suspect on the premises is not required. Magluta, 44 F.3d at 1535, 1538.[2]

_____

   [2] While surveillance certainly may bolster a Payton entry, the cases fail to reveal any requirement of substantial prior surveillance of a residence prior to entry. Compare Harper, 928 F.2d at 896, (police conducted "intermittent surveillance"), and Edmonds, 52 F.3d at 1248 (police surveilled apartment complex for less than three hours and saw all the cars depart except for a black Mustang associated with the arrestee), with Lauter, 57 F.3d at 213

Indeed, the officers may take into account the fact that a person involved in criminal activity may be attempting to conceal his whereabouts. Id., at 1538. The suspect's presence may be suggested by the presence of an automobile, United States v. Morehead, 959 F.2d 1489, 1496 (10th Cir. 1992), aff'd on other grounds sub nom., United States v. Hill, 971 F.2d 1461 (10th Cir. 1992) (en banc); United States v. Beck, 729 F.2d 1329, 1331-32 (11th Cir. 1984); Magluta, 44 F.3d at 1537-38; the time of day, United States v. Terry, 702 F.2d 299, 319 (2d Cir.), cert. denied, 461 U.S. 931, 104 S.Ct. 482, 77 L.Ed.2d 304 (1983) (reasonable to believe suspect would be at home at 8:45 a.m. on Sunday morning); Edmonds, 52 F.3d at 248 (entry at 6:45 a.m. was "early enough that it was unlikely someone living in the apartment would have already departed for the day"); Anderson, 1996 WL 731244 ("the officers came to the home at 8:45 p.m., on a cold, snowy evening, a time when a person would reasonably be expected to be at home"); observing the operation of lights or other electrical devices, Route, 104 F.3d at 63 (officers heard television set left on inside residence after third person left residence); Magluta, 44 F.3d at 1538 (observations that "the lawn was manicured and a porch light was on" gave "no indication that Magluta departed, such as for work or the like"); Morehead, 959 F.2d at 1496 (holding that an illuminated light provided a reasonable basis for officers to believe the subject of an arrest warrant was within the building); and the

---

(facts suggest no prior surveillance of the residence) and United States v. Beck, 729 F.2d, 1329, 1331-32 (11th Cir. 1984) (same).

circumstances of a suspect's employment, <u>Lauter</u>, 57 F.3d at 215 (officer's conduct reasonable since they knew the suspect "was unemployed and typically slept late"); <u>United States v. Woods</u>, 560 F.2d 660, 665 (5th Cir. 1977), <u>cert. denied</u>, 435 U.S. 906, 98 S.Ct. 1452, 55 L.Ed.2d 497 (1978) (reasonable to believe suspect would be "at his place of abode, especially at 8:30 in the morning for a man not known to be working"). And the officers may consider an absence of evidence the suspect is elsewhere. <u>See</u> <u>Terry</u>, 702 F.2d at 319 (one factor in supporting reasonableness was twelve-year-old son's failure to indicate father was not inside). No single factor is, of course, dispositive. Rather, the court must look at all of the circumstances present in the case to determine whether the officers entering the residence had a reasonable belief that the suspect resided there and would be found within.[3]

In the present case, the Salt Lake City Police Department had informed the FBI that Raymond "comes into the city on weekends, does a burglary or two then goes back to the Indian reservation at LaPoint, Utah." BIA Lt. Reynolds told defendant McPheters

---

[3] One consideration which is not relevant to this determination involves information gained after the entry. Since the focus is the reasonableness of the officers' actions, evidence which is obtained after the entry cannot be used to establish the legality of those actions or, conversely, invalidate an otherwise reasonable entry. Here, for example, when Raymond finally surrendered himself on December 27, 1993, he was asked for his address while he was being booked. He responded by stating that he lived at the Valdez residence in LaPoint. Since this information was not known to the defendants at the time of the entry into the Valdez residence, it cannot retroactively justify the defendants' conduct.

that Raymond lived with his mother. Raymond himself had told BIA Officer

Littlewhiteman in September that he lived with his mother. Littlewhiteman also had seen

a white pickup truck at the Valdez house, which he knew was driven by a friend of

Raymond's.[4] Another BIA officer told Littlewhiteman that Raymond was at the Valdez

house on December 3. On December 4, the white pickup truck was found wrecked near

the Valdez house and footprints led from the truck toward the Valdez house.

Littlewhiteman submitted an affidavit stating that he knew Raymond would

probably be home around midday, since he knew Raymond was unemployed, liked to stay

out late drinking, sometimes abused drugs such as heroin and cocaine, and was suspected

of having committed at least two nighttime burglaries.[5] Significantly, the plaintiff did not

---

[4] The plaintiff suggests an alternative explanation for the pickup's presence at her house, stating that Tom was a friend of hers, and that the pickup truck was present when Tom came to visit not Raymond Valdez, Jr., but the plaintiff. As with the after-the-fact determination about where Raymond actually lived, the true reason for the pickup truck's presence is not controlling. Rather, the case must be decided on the basis of what the officers knew at the time of their entry into the residence. Here, there is no evidence McPheters and Littlewhiteman had any reason to take the frequent presence of the white pickup truck as anything other than another indication that the suspect continued to reside in the Valdez house.

[5]The dissent seeks to minimize these uncontroverted facts by treating the officers' conclusion as a single piece of "evidence", when the conclusion itself is grounded on these several facts known by the defendants prior to their first entry. Additionally, although not articulated as such, the dissent seemingly applies a standard much closer to "probable cause" than "reasonable belief." While probable cause itself is a relatively low threshold of proof, it is a higher standard than "reasonable belief", which is, as everyone agrees, the appropriate standard. See Alabama v. White, 496 U.S. 325,329, 110 L.Ed.2d 301,308, 110 S.Ct. 2412 (1990) (noting "the lesser showing required" for reasonable suspicion); Beall v. Moore, Slip. op., Case No. 96-2095, 1997 WL 234786 (10th Cir. May 7, 1997) ("satisfaction of the higher

-14-

attempt to offer any facts which would contradict Littlewhiteman's affidavit on Raymond's suspected nocturnal activities. In her response to the summary judgment motion, plaintiff complains that the affidavit was "nonsensical, non-factual and therefore irrelevant." (R. Exh. 3 at ¶ 17). She does not, however, offer any evidence which would controvert this portrait of Raymond Valdez, Jr.'s night life. The evidence of late-night drinking, drug abuse, and unemployment is therefore uncontroverted. More importantly, the ultimate accuracy of the affidavit's characterization of Raymond's lifestyle is not significant. What is significant, and also uncontroverted, is that Littlewhiteman had been presented with such information prior to the entry into the Valdez residence. Finally, after the first search on December 7, a witness (Sherman DuBois) told McPheters and Littlewhiteman that he had seen Raymond at the Valdez residence earlier that day.

Plaintiff Valdez stresses that she denied to the defendants that Raymond lived there or that she and her family knew where he in fact was. It is also stressed that the Salt Lake County Attorney Fact Sheet prepared in connection with the investigation lists Raymond's address as "transient." (R. Exh. 7 at 1). If this were the only evidence in the case as to Raymond's residence, it would of course fatally undermine the defendants' qualified immunity based on an objective belief Raymond lived at the Valdez residence. But, under the circumstances of the case, such information only tends to support a

---

probable cause standard necessarily entails satisfaction of the reasonable suspicion standard").

-15-

determination of qualified immunity. That is, the officers knew from a variety of sources that Raymond had been living with his mother, including Raymond's own statements in the presence of defendant Littlewhiteman. The fact that the suspect was otherwise known to be young, unemployed, and "transient" suggests, if anything, that he was still living with his family in the Valdez residence.

Given the facts present in the case, the district court did not err in concluding that the defendants could have reasonably concluded that Raymond Valdez, Jr. lived in the residence, and that he would likely be present inside.[6]

AFFIRMED.

---

[6] It may be noted that even under the "actual presence" test suggested by the Ninth Circuit in Harper, there are grounds for affirming the district court's award of summary judgment. In Harper, the court held that evidence available to the officers supported an entry without a search warrant, although "just barely." 928 F.2d at 896-97. Specifically, the court noted that the officers knew (1) the suspect's brothers lived in the residence, (2) according to "an uncorroborated source," the suspect himself lived there, (3) the police saw automobiles belonging to the suspect's known associates parked at the residence, (4) through "intermittent surveillance" the suspect had been seen entering the residence with his own key during the days prior to the entry, and (5) the suspect had lived with his family at another residence before a previous incarceration "suggesting that he had no independent residence and would resume living with them upon his release." 928 F.2d at 896. This fact pattern is strikingly similar to the present case. While Valdez was not seen entering the residence "with his own key," the defendants had been informed of his residence in the house not by "an uncorroborated source" but by Raymond Valdez's own admission, in the presence of Officer Littlewhiteman, that he lived with his mother. Valdez's family lived in the residence, he was reportedly in the residence in the days prior to the entry, an automobile of a known associate was observed at the residence, and the circumstances of Valdez's life suggested he would likely be at the residence at the time the officers arrived.

97-4057, <u>Valdez v. McPheters</u>

**EBEL, Circuit Judge, concurring in part and dissenting in part.**

The majority states the legal standard under <u>Payton</u> as follows: "[D]efendants were entitled to enter the Valdez residence if there was a reasonable basis for believing that Raymond Valdez, Jr. both (1) lived in the residence and (2) could be found within at the time of entry." Maj. Op., <u>ante</u>, at 10. Applying this test, the majority found that agents McPheters and Littlewhiteman (collectively "defendants" or "agents") possessed a reasonable basis for concluding that Raymond Nathaniel Valdez ("Raymond") resided at his mother's home and that he was present when they conducted their warrantless, nonconsensual search. Because I disagree with the latter conclusion, I respectfully dissent.

**I.      <u>Payton</u>'s First Prong:  Suspect's Residence**

The majority concludes that the defendants reasonably believed that Raymond resided at his mother's home for <u>Payton</u> purposes. In doing so the majority, for the first time in this circuit, articulates the standard of certainty officers must have about a suspect's residence before entering with only an arrest warrant. While ultimately I agree with the majority that the defendants have made a sufficient showing under <u>Payton</u>'s first requirement to entitle them to qualified immunity, I write separately on this issue to discuss what level of certainty <u>Payton</u> and the Fourth Amendment require an officer to possess regarding whether a suspect resides at a certain location before entering that residence on the basis of an arrest warrant alone.

The majority correctly notes that the other circuits to consider the issue have almost unanimously adopted the reasonable belief standard for residence. See Maj. Op., ante, at 7-9. The reasons for doing so have been articulated with varying degrees of clarity in the opinions cited by the majority. See United States v. Route, 104 F.3d 59, 62 (5th Cir.), cert. denied, 117 S. Ct. 2491 (1997); United States v. Risse, 83 F.3d 212, 216 (8th Cir. 1996); United States v. Lauter, 57 F.3d 212, 215 (2d Cir. 1995); United States v. Edmonds, 52 F.3d 1236, 1248 (3d Cir. 1995); United States v. Magluta, 44 F.3d 1530, 1535 (11th Cir. 1995).

I have no doubt that within the qualified immunity context, the majority articulates the proper standard. In Anderson v. Creighton, the Supreme Court held that government agents performing discretionary duties are entitled to qualified immunity so long as their complained-of actions were objectively legally reasonable "assessed in light of the legal rules that were 'clearly established' at the time [the actions were] taken." 483 U.S. 635, 639 (1987) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 819 (1982)). In another context, this court has recognized that in a § 1983 action, we must assess government agents' actions under the appropriate substantive law modified by a "reasonable officer" standard. See Romero v. Fay, 45 F.3d 1472, 1476 (10th Cir. 1995) ("When a warrantless arrest is the subject of a § 1983 action, the defendant arresting officer is 'entitled to immunity if a reasonable officer could have believed that probable cause existed to arrest' the plaintiff." (quoting Hunter v. Bryant, 502 U.S. 224, 228 (1991)). Here, Payton dictates the clearly

established law: "[For Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." Payton, 445 U.S. at 603. While the language of Payton implicates no reasonableness standard as to a government agent's belief regarding a suspect's residence, the qualified immunity rationale requires that we assess whether "the suspect lives" within the "dwelling" entered according to what a reasonable officer would believe. Cf. Romero, 45 F.3d at 1476. In this case the record indicates that the officers had sufficient indicia — barely sufficient — to form a reasonable belief that Raymond resided at the Valdez family home in La Point, Utah. Accordingly, I concur with the majority that the agents have sufficiently met Payton's first requirement for qualified immunity purposes.

## II.    Payton's Second Prong:  Suspect's Presence

In order to be entitled to summary judgment based on qualified immunity, the agents also must meet the second requirement of Payton's clearly established law – they must have possessed a "reason to believe the suspect [was] within" Mrs. Valdez's home at the time they entered. See Payton, 445 U.S. at 603. As the majority correctly observes, in assessing whether a government agent's belief of presence was reasonable "courts 'must be sensitive to common sense factors indicating a resident's presence.'" Maj. Op., ante, at 11 (quoting United States v. Magluta, 44 F.3d 1530, 1535 (11th Cir. 1995)). In

-3-

this case, common sense belies a finding that the officers had a reason to believe

Raymond was within the Valdez family home in La Point, Utah when they executed their

search.

The majority catalogues a number of circumstances that this and other circuit

courts have recognized as bases for a reasonable belief of a suspect's presence within his

home. Specifically, the majority identifies "presence of an automobile, . . . the time of

day, . . . operation of lights or other electrical devices, . . . and the circumstances of a

suspect's employment" as recognized evidence of presence. See Maj. Op., ante, at 12-13.

Notwithstanding the myriad ways to infer presence and the forgiving standard for

evaluating whether an officer's belief of a suspect's presence is reasonable, this case

stands in stark contrast to those cited by the majority because the instant record is devoid

of any reliable evidence known to the agents indicating that Raymond was actually home

at the time of the defendants' search.

The majority cites exactly one piece of evidence[1] in support of its conclusion that

the agents reasonably believed Raymond was home when they searched his mother's

residence:

> Littlewhiteman submitted an affidavit stating that he <u>knew Raymond</u>
> <u>would probably be home around midday</u>, since he knew Raymond was

---

[1]I deal here with only the first of the two unsuccessful searches executed by the agents on December 7, 1993, at the Valdez home. For purposes of a cause of action under § 1983 predicated upon that first search, I find it irrelevant that "after the first search on December 7, a witness (Sherman DuBois) told McPheters and Littlewhiteman that he had seen Raymond at the Valdez residence earlier that day." Maj. Op., ante, at 15.

-4-

unemployed, liked to stay out late drinking, sometimes abused drugs such as heroin and cocaine, and was suspected of having committed at least two nighttime burglaries. Significantly, the plaintiff did not offer any facts which would contradict Littlewhiteman's affidavit on Raymond's suspected nocturnal activities.[2]

Maj. Op., <u>ante</u>, at 14-15 (emphasis added) (footnote omitted). Based upon this "portrait of Raymond Valdez, Jr.'s night life," the officers claim they formed a reasonable belief that Raymond would be home at noon on December 7, 1993. In my estimation, <u>Payton</u>'s second prong requires more.

At most, this "evidence" of Raymond's lifestyle implicates the interrelated "time of day" and "circumstances of employment" factors identified by the majority. According to the "time of day" cases cited, <u>ante</u> at 12, early morning has been recognized as a time when suspects can probably be found at home. <u>See</u> <u>United States v. Edmonds</u>, 52 F.3d 1236, 1248 (3d Cir. 1995) ("The agents came to the apartment to arrest Carlton Love at 6:45 a.m., early enough that it was unlikely someone living in the apartment would have

---

[2]Moreover, the majority's paraphrasing of Littlewhiteman's declaration implies a greater level of certainty regarding finding Raymond at his mother's house at noon on December 7, 1993, than the words Littlewhiteman used under oath. Instead of stating that he "knew" that Raymond would be home around midday or that he "knew" about Raymond's lifestyle, Littlewhiteman actually said only that he had "information" that "indicated that Valdez was unemployed, that he liked to stay out late at night drinking, that he sometimes abused drugs such as heroin and cocaine, and that he was suspected of having committed at least two burglaries which had occurred at night. Based on his lifestyle, I <u>believed</u> that Valdez would be at the Valdez residence when we went looking for him about noon."

As indicated in the text of my dissent, this information is inadequate, in my opinion, to support any reasonable belief as to where Raymond could be found at noon on December 7, 1993. If anything, it merely emphasizes Raymond's itinerate and unstructured lifestyle and it establishes that no one had any reasonable basis for concluding that he would be at his mother's home at noon on December 7.

already departed for the day."); United States v. Terry, 702 F.2d 299, 319 (2d Cir. 1983) ("[T]he agents arrived at the apartment at 8:45 A.M. on a Sunday morning, a time when they could reasonably believe that Terry would be home."). Further, this court recognized in an unpublished disposition that "8:45 p.m., on a cold, snowy evening, [is] a time when a person would reasonably be expected to be at home." Anderson v. Campbell, No. 95-6459, 1996 WL 731244, at **3 (10th Cir. Dec. 20, 1996).

Significantly, the officers in all three of the "time of day" cases cited by the majority had other indicia of presence besides the time of day at which they conducted their search. In Edmonds, the officers arrived at 6:45 a.m., and "[o]n their arrival, the observed the [defendant's] black Mustang parked in front of the apartment." 52 F.3d at 1248. In Terry, "[w]hen the agents arrived at the apartment building, a 12-year old boy wearing a shirt with the name 'Terry' on it told them his father and mother lived in the apartment and did not indicate that his father was not home." 702 F.2d at 319. In Anderson, when officers approached the defendant's front door, they observed a man through the window who had "basically the same height, weight and facial features . . . [who] looked young enough for the warrant's physical description of the suspect to have easily matched him." Anderson, 1996 WL 731244, at **3 (quotation marks omitted). Thus, these cases stand for the proposition that "time of day" plus other indicia of presence can support Payton's reasonable belief of presence requirement. See also United States v. Beck, 729 F.2d 1329, 1331-32 (11th Cir. 1984) ("Beck's car, identified

-6-

by the agents, was parked nearby; and it was reasonable to believe that one would be at home at 7:30 a.m. and be sound asleep . . . .").

The "circumstances of a suspect's employment" cases provide the best support for the majority's conclusion that agents McPheters and Littlewhiteman reasonably believed Raymond was present when they searched his mother's home. In <u>United States v. Lauter</u>, 57 F.3d 212, 215 (2d Cir. 1995), the Second Circuit deemed reasonable an ATF agent's belief of a suspect's presence at his basement apartment during an 8:30 a.m. raid after a tip from a "reliable CI" that the suspect "was unemployed and typically slept late," and had moved into the basement apartment that weekend. That case is distinguishable, both because of the quality of the confidential informant's information and the earlier time of morning for the entry. In <u>United States v. Woods</u>, 560 F.2d 660, 665 (5th Cir. 1977), the Fifth Circuit acknowledged that "there is no indication in the record that the officers had reason to know whether appellant would be at his home when they went there to execute the arrest warrant," however, the court nonetheless found "it a reasonable anticipation on the officers' part to believe that a person would be at his place of abode, especially at 8:30 in the morning for a man not known to be working . . . ." That case may similarly be distinguishable from the present case based on the early-morning nature of the search. Although to the extent it is not distinguishable, I would not follow its relaxed standard for meeting <u>Payton</u>'s second prong.

Here, the agents paint a vague picture of Raymond as an unemployed, late-night drinking, drug-abusing party-goer. Accepting that picture as accurate, I find that the agents presented no evidence that Raymond had engaged in any late-night activities, let alone drinking or drug abuse, the night before they conducted their search. Further, the agents presented no evidence — assuming that Raymond had painted the town the night before the search — that he retired to his mother's house after the revelry ended. In light of the agents' knowledge of Raymond's "transient" nature, I find the leap too great from their general impressions of Raymond's lifestyle to a reasonable belief that he would be present at his mother's house at noon on the random day they chose to search. See Blake v. Peterson, No. 94-C-6561, 1995 WL 360702, at *10 (N.D. Ill. June 14, 1995) ("Even more significant [as to their belief of presence], the agents in Edmonds[, 52 F.3d at 1248,] were certain that their suspect was presently residing at the apartment that they entered pursuant to the arrest warrant. In the instant case, agents did not . . . establish that the suspect actually resided at [residence searched]."). There was nothing in the record to suggest that Raymond stayed at his mother's house on a routine or even frequent basis. Given all the other locations where he could have been on that particular day in light of his peripatetic, criminal, and unstructured lifestyle, there was absolutely no reason to believe that he was in fact in his mother's home on that particular day at that particular time.

The majority correctly explains that "[d]irect surveillance or the actual viewing of the suspect on the premises is not required." Maj. Op., ante, at 11-12. However, officers must possess some specific facts that indicate a suspect will be found within his or her home at the time, on the day the officers decide to search, in order to justify entry into a suspect's home based on an arrest warrant alone. By sanctioning the search of agents McPheters and Littlewhiteman, the majority today almost entirely eviscerates the second requirement that Payton imposes before an agent, armed only with an arrest warrant, can enter a suspect's home. The limited rule permitting early-morning or late-evening searches when other evidence indicates that a suspect is at home, now extends until noon. I cannot say that Payton's "limited authority" to enter a suspect's dwelling — "the chief evil against which the wording of the Fourth Amendment is directed," Payton, 445 U.S. at 585 (quotation omitted) — can be extended to almost any time of day based only on an officer's belief that a suspect has a penchant to drink or stay out late. Because the officers here had no specific reason to believe that Raymond was drinking, abusing drugs, or out late partying the night before their December 7, 1993 search, and because the officers had no reason to believe that he would have returned to his mother's home even if he had been engaged in any of these activities, I find their belief that he would be at his mother's at noon on the day they decided to search to be unreasonable.