Lars N. ANDERSON and Lana W. Anderson, Appellants,

v.

STATE of Alaska, Appellee.

Nos. A–9003, A–9005.

Court of Appeals of Alaska.

Oct. 20, 2006.

Steven P. Gray, Kodiak, for the Appellants.

Kenneth M. Rosenstein, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and David W. Márquez, Attorney General, Juneau, for the Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

## OPINION

MANNHEIMER, Judge.

Lars and Lana Anderson were convicted of hindering prosecution in the first degree for hiding their son in their house, and lying to law enforcement officers about his whereabouts, when they knew that the authorities were trying to arrest their son for violating his felony probation.

The Andersons' appeal presents two issues. First, does the Andersons' conduct fit within the statutory definition of first-degree hindering prosecution, AS 11.56.770(a)? And second, did the police violate the Andersons' constitutional rights when they entered the Andersons' home and searched the Andersons' bedroom for their son?

For the reasons explained here, we conclude that the Andersons' conduct falls within the definition of first-degree hindering prosecution, and we further conclude that the police entry into the Andersons' home, and the ensuing search of the Andersons' bedroom, were constitutional. We accordingly affirm the Andersons' convictions.

### Underlying facts

As explained above, this case involves the efforts of law enforcement officers to arrest the Andersons' twenty-year-old son, Daniel Anderson, for violation of his felony probation. Daniel was convicted of third-degree sexual abuse of a minor in 2002; he received a sentence of 48 months' imprisonment with 42 months suspended (6 months to serve), and he was placed on probation for 7 years.

On the night of March 24, 2004, Sergeant Kyle Valerio of the Kodiak Police Department responded to a noise disturbance at the apartment of Matt Stutes. Daniel Anderson was present when the officer arrived, but he identified himself as "James Coyt Anderson". (James Anderson was Daniel's younger brother.)

Daniel appeared to be intoxicated. Because Daniel was a minor, Valerio asked him to submit to a portable breath test. Daniel said that he would take the test, but he proceeded to provide invalid breath samples. Sergeant Valerio then issued Daniel a citation for being a minor in possession of alcoholic beverages.

When Valerio returned to the police station, he discovered Daniel's true identity from a collection of adult probationer photographs. He also realized that Daniel was on felony probation. Daniel's conditions of probation expressly prohibited him from consuming alcohol. In addition, because Daniel

was 20 years old, his consumption of alcohol violated state law.[1]

Valerio returned to Matt Stutes's apartment to look for Daniel, but it appeared that Daniel was no longer there. Valerio observed that a blue Chevrolet that had earlier been parked outside the apartment, and that was registered to Daniel's father, Lars Anderson, was no longer there.

A little later that night (around 1:00 a.m. on March 25th), Valerio discovered that the blue Chevrolet was now parked outside the residence of Lars and Lana Anderson, 415 Maple Street. Valerio therefore went up to the Andersons' house in search of Daniel.

Daniel's mother, Lana Anderson, answered the door. Sergeant Valerio explained to her that Daniel had provided false identification earlier in the evening, and that Valerio wished to speak with him. Lana Anderson confirmed that Daniel lived with her and her husband; she told Valerio that Daniel slept on the couch. Lana told Valerio that she did not think Daniel was home at present.

Valerio asked for permission to enter the house to look for Daniel, but Lana refused. She then agreed to search the house herself, but she again asserted that she did not think Daniel was there. At that point, Lana's husband Lars appeared. Lars confirmed that Daniel was not home.

Valerio reminded the Andersons that Daniel was on felony probation, and that he (Valerio) could return with Daniel's probation officer to search the house.

Following the interaction with Lars and Lana Anderson a second police officer went to Stutes's apartment to inquire about Daniel's whereabouts. Stutes told this officer that, because Daniel was intoxicated, Stutes and another friend used Daniel's car (*i.e.*, the blue Chevrolet registered to Lars Anderson) to drive Daniel home. Stutes drove Daniel to his parents' house and watched Daniel go inside.

At about 2:00 a.m. (that is, approximately one hour after Sergeant Valerio spoke to Lana and Lars Anderson at their home), this second police officer returned to the Andersons' house, accompanied by Daniel's probation officer, Sherry Saunders. Saunders and the police officer knocked on the door repeatedly, but no one answered—although they observed movement behind the blinds, indicating that someone was home.

Several hours later that morning, at around 9:00 a.m., Saunders telephoned the Andersons' residence. Lars spoke to the probation officer and informed her that Daniel was not there. Lars told Saunders that Daniel had not come home the previous night.

Two hours later, at 11:00 a.m., Daniel called the probation office. He informed Saunders' office that he was "at a friend's house in the Flats." Daniel was instructed to come to the office, but he never showed up. Saunders then filed a petition to revoke Daniel's probation and asked the court to issue a bench warrant for Daniel's arrest, since Daniel "ha[d] been consuming alcohol and at this time his whereabouts are unknown." The revocation petition listed Lars and Lana Andersons' address, 415 Maple Street in Kodiak, as Daniel's last known address.

The following day (March 26th), the court issued the requested warrant for Daniel's arrest. Apparently believing that Daniel would have left his parents' residence by then, Saunders provided the Alaska State Troopers with a list of other locations where Daniel might be found.

The troopers first went to a residence in Bells Flats. When they could not find Daniel there, they proceeded to a residence at 323 Maple Street (*i.e.*, a residence down the street from Lars and Lana Anderson's home). It was then that one of the troopers noticed that the blue Chevrolet (the car that Daniel had been using) was parked outside the Andersons' residence at 415 Maple Street.

Sergeant Valerio drove to Maple Street and joined the three state troopers at the Andersons' residence to execute the arrest warrant. They arrived there at about 6:00 in the evening. (Probation Officer Saunders was not present.)

---

1. AS 04.16.050(a).

The troopers knocked on the doors, the windows, and the walls of the Anderson home, but nobody answered. The trooper dispatcher called the house several times and left messages informing the Andersons that the troopers were stationed outside the house, that they had come to arrest Daniel, and that anyone inside the house was required to open the door. In addition, one of the troopers proclaimed loudly that the troopers had a warrant for Daniel's arrest, that they believed that Daniel was in the house, and that any adult who harbored Daniel within the house would be arrested for hindering prosecution.

Sergeant Valerio could hear music from inside the house. He also noticed a small child peer out of a window briefly, but then someone pulled the child back behind the closed blinds. Drawn by the commotion, people began gathering in the yards of the neighboring houses. Still, no one inside the Andersons' house responded to the troopers.

After waiting about 15 or 20 minutes, the troopers kicked the door open and entered the house—where they found Lars and Lana Anderson. Lana told the troopers that Daniel had been at the house earlier, and she added that she thought he might still be in the house. Lars then indicated that Daniel was in the back bedroom. The troopers proceeded to the back of the house and found Daniel in the bedroom, hiding under a desk and concealed by a blanket, with a chair blocking access to him. The troopers arrested Daniel.

Based on this incident, Lars and Lana Anderson were charged with hindering prosecution in the first degree, AS 11.56.770(a). Both of the Andersons eventually pleaded no contest, reserving their right to litigate the issues raised in this appeal.[2]

*The Andersons' conduct falls within the definition of first-degree hindering prosecution*

Under AS 11.56.770(a)(1), a person commits the crime of hindering prosecution in the first degree if they (1) "render[ ] assistance" (2) "to a person who has committed a

crime punishable as a felony", and if they render this assistance (3) "with [the] intent to ... hinder the apprehension, prosecution, conviction, or punishment" of the person who has committed the felony.

(Subsection (b) of the statute defines various prohibited methods of "render[ing] assistance". The two pertinent methods, under the facts of the Andersons' case, are (b)(1) ("harbor[ing] or conceal[ing] the other person") and (b)(4) ("prevent[ing] or obstruct[ing], by means of force, threat, or deception, anyone from performing an act which might aid in the discovery or apprehension of the other person").)

The Andersons do not dispute that they harbored and concealed their son, nor do they dispute that they used deception in an attempt to frustrate the discovery and arrest of their son. They argue, however, that their son was not "a person who has committed a crime punishable as a felony" within the meaning of AS 11.56.770(a).

The Andersons do not dispute that they knew that their son was convicted of a felony in 2002, and that their son was on felony probation at the time of the events in this case. The Andersons point out, however, that the authorities were looking for Daniel, not because he had committed a new felony, but because he had violated his felony probation in ways that were not, themselves, felonies. Rather, Daniel's violations of probation were lesser crimes: consuming alcoholic beverages as a minor, and (potentially) giving Valerio false information concerning his identity when Valerio contacted him at the Stutes residence. *See* AS 11.56.800(a)(1)(B)(i).

The Andersons argue that the first-degree hindering prosecution statute should not be construed to cover all acts of assistance to anyone who, at some time in the past, has committed a felony. Rather, the Andersons argue, the statute must be construed to cover only acts of assistance to someone who is currently being sought for felony conduct. The Andersons contend that, because their son Daniel was not being sought for his 2002 felony, nor for any new felony, but rather for his violations of probation the night before,

2. *See Cooksey v. State,* 524 P.2d 1251, 1255–57 (Alaska 1974).

their act of harboring and concealing Daniel did not constitute first-degree hindering prosecution.

▮ The question, then, is whether the offense of hindering prosecution in the first degree encompasses the act of rendering assistance (within the meaning of AS 11.56.770(b)) to felony probationers who have committed misdemeanor or even non-criminal violations of their probation. For the reasons explained here, we conclude that the answer is "yes".

To convict a defendant of first-degree hindering prosecution under AS 11.56.770(a), the State must prove that the defendant rendered assistance to a person "who has committed a crime punishable as a felony". A person on felony probation has, by definition, "committed a crime punishable as a felony".

The statute further requires proof that the defendant, in rendering the assistance, acted with the intent to "hinder the apprehension, prosecution, conviction, or punishment" of the person who committed the felony.

One could certainly argue that a person who hides a felony probationer in their house, knowing that the police are seeking to arrest the probationer for violating probation, acts with the intent to hinder the "apprehension" of that probationer. The counter-argument would be that, given the wording of the statute—in particular, the order of the words "apprehension, prosecution, conviction, [and] punishment"—it appears that the legislature may have been reciting the various stages of a criminal prosecution in chronological order. If so, then "apprehension" might refer only to the apprehension of a defendant before trial.

But however that issue might be resolved, the statute also covers assistance that is rendered with the intent to "hinder the ... punishment" of a person who has committed a felony. This description fits the Andersons' conduct in the present case.

**3.** See AS 12.55.085(b) & AS 33.05.070(b).

**4.** AS 12.55.090(b) & (c); *O'Shea v. State,* 683 P.2d 286, 288 (Alaska App.1984).

▮ When a felony defendant receives a term of suspended imprisonment and is released on probation, the defendant's liberty is conditional: if the defendant violates probation, the sentencing court can increase the defendant's punishment by imposing some or all of the suspended imprisonment,[3] or by extending the defendant's term of probation.[4] When this occurs, the additional term of imprisonment or the extended term of probation is not a punishment for the defendant's new conduct—even though that new conduct may itself be an independent criminal offense. Rather, the altered sentence is a revision of the defendant's punishment for the underlying felony. As we said in *Toney v. State,* 785 P.2d 902, 903 (Alaska App.1990), "a sentence imposed upon revocation of probation constitutes punishment for the defendant's original offense".[5]

Thus, when a person renders assistance to a felony probationer by harboring or concealing the probationer, knowing that the police are trying to arrest the probationer for violating the terms of probation, the person acts with the intent to "hinder the punishment" of "a person who has committed a felony" within the meaning of AS 11.56.770(a)(1).

We acknowledge that courts from around the country are split on the question of whether their particular felony hindering prosecution statutes cover the rendering of aid to people who are wanted for felony probation violations. Generally, these courts' interpretations of their statutes hinge on a close parsing of the statutory language. The broader the language describing the group of people aided, the wider the range of persons covered by the hindering prosecution statute.

*Compare State v. Sapp,* 55 S.W.3d 382 (Mo.App.2001), *Key v. State,* 800 S.W.2d 229, 230–31 (Tex.App.1990) (holding that their statutes do not cover the rendering of aid to persons who are sought for non-felony violations of their felony probation) *with State v. Fisher,* unpublished, 2005 WL 750071 at *2 (Ohio App.2005), *Commonwealth v. Stiver,*

**5.** See also *Reyes v. State,* 978 P.2d 635, 639 (Alaska App.1999) (the upward modification of a defendant's sentence when the defendant's probation is revoked does not violate the double jeopardy clause).

unpublished, 1994 WL 722526 (Pa. Common Pleas 1994) (holding that their statutes do cover the rendering of aid in such circumstances).

Alaska's hindering prosecution statutes, AS 11.56.770 (felony hindering) and AS 11.56.780 (misdemeanor hindering), are based on the corresponding statutes in the Hawai'ian penal code.[6] There is no Hawai'i case law addressing the question of whether a person may be prosecuted for felony hindering if they render assistance to a felony probationer who is being sought for a non-criminal (or at least a non-felony) violation of probation. However, the Hawai'ian statutes are based on the Model Penal Code.[7]

The Model Penal Code commentary likewise contains no discussion of this particular point, but the commentary does explain the rationale of the hindering prosecution statutes. In the commentary, the Model Penal Code drafters declared that they wished to codify an offense which, although similar to the common-law offense of "accessory after the fact", would be constructed in a way that "breaks decisively from that [common-law] tradition":[8]

> Section 242.3 [of the Model Penal Code] rejects the theory of accessorial liability for those who aid the offender after the consummation of the crime and adopts the alternative theory of prosecution for obstruction of justice. A person who aids another to elude apprehension or trial is interfering with the processes of government. The willingness to do that and the harm threatened by such behavior are the appropriate focus for penal sanctions, not the fiction that one who harbors a murderer thereby becomes a party to criminal homicide.

Model Penal Code (1980), § 242.3, Commentary, p. 225.

Given this underlying purpose of the statutes that prohibit hindering prosecution— i.e., the punishment of people who intention-

ally obstruct the criminal justice system—it makes sense to interpret AS 11.56.770(a) to encompass the act of harboring and concealing a person who is being sought for violating their felony probation, even if the act that contravened the terms of probation is not itself a felony.

Another reason to interpret AS 11.56.770(a) in this manner is the fact that, if we interpreted the statutory language as the Andersons propose—that is, if we interpreted "has committed a crime punishable as a felony" to apply only when a probationer is being sought for a new felony—this would create a gap in Alaska law.

We note that both of Alaska's hindering prosecution statutes (AS 11.56.770 and AS 11.56.780) contain similar language: section 770 refers to aiding a person who "has committed ... a felony", while section 780 refers to aiding a person who "has committed ... a misdemeanor". If we interpreted this language as requiring proof that a probationer had committed a *new* crime punishable as a felony or a misdemeanor, this would mean that neither statute applied to the act of rendering assistance to a probationer whose violation of probation was non-criminal. We doubt that the legislature intended such a result.

The Andersons argue that our interpretation of the hindering statutes leads to anomalous results, especially in instances where the probationer's violation of probation might not be a crime at all—as, for instance, when an adult probationer violates probation by consuming alcohol or by leaving their town of residence without first notifying their probation officer. In such instances, the Andersons argue, it would be unfair to impose criminal sanctions on a person who harbors or conceals the probationer, when the probationer would not face any criminal penalty for their violation of probation.

The flaw in this argument lies in the principle that we explained earlier: When a sen-

---

6. *See* Alaska Criminal Code Revision, Tentative Draft, Part 4 (1977), p. 126; *see also Noblit v. State,* 808 P.2d 280, 283 n. 4 (Alaska App.1991).

7. *See Noblit v. State,* 808 P.2d 280, 283 n. 4 (Alaska App.1991).

8. Model Penal Code (1980), § 242.3, Commentary at p. 224.

tencing court revokes a felony defendant's probation and imposes some or all of a previously suspended term of imprisonment, this is *not* punishment for the act that contravened the defendant's conditions of probation. Rather, it is a revised punishment for the defendant's underlying felony. Thus, even when a felony probationer's act of violating probation is not itself a crime, the probationer still faces felony punishment—potentially, the imposition of several more years in prison. Accordingly, the law's interest in deterring people from harboring and concealing a felony probationer is correspondingly high.

For these reasons, we conclude that the first-degree hindering prosecution statute, AS 11.56.770(a)(1), encompasses the conduct of the Andersons in this case: rendering assistance to a felony probationer when they knew that the police were attempting to take the probationer into custody for violations of probation, and with intent to hinder the punishment of the probationer.

### The first-degree hindering statute is not void for vagueness

The Andersons argue that, even if our interpretation of AS 11.56.770(a) is a reasonable one, there are other reasonable interpretations of the statute. The Andersons further argue that, because reasonable people could differ as to what the statute prohibits, the statute is void for vagueness.

We addressed this same argument in *De Nardo v. State*, 819 P.2d 903 (Alaska App. 1991). In *De Nardo,* we explained that a statute is unconstitutionally vague only if "its meaning is unresolvably confused or ambiguous *after* it has been subjected to legal analysis." *Id.* at 908 (emphasis in the original).

> [T]he fact that people can, in good faith, litigate the meaning of a statute does not necessarily (or even usually) mean that the statute is so indefinite as to be unconstitutional.... If study of the statute's wording, examination of its legislative history, and reference to other relevant statutes

and case law makes the statute's meaning clear, then the statute is constitutional. *Id.*

In the Andersons' case, using accepted methods of statutory construction, we have concluded that the first-degree hindering prosecution statute applies to people who, acting with the intent to hinder the punishment of a felony probationer, render assistance to a probationer who is sought by the authorities for violations of probation. Given our interpretation of the statute, the statute clearly applies to the Andersons' conduct. Accordingly, the statute is not void for vagueness.

### The police entry into the Andersons' house was lawful

As explained earlier in this opinion, the superior court issued a warrant for Daniel Anderson's arrest, based on his alleged violations of probation, and the troopers were armed with this warrant when they went to Lars and Lana Anderson's house on the morning of March 26th.

Under *Payton v. New York,*[9] if the police have a warrant authorizing them to arrest a person, and if the police have reason to believe that the person named in the warrant can be found in their home, the police may enter that person's home to perform the arrest. However, the Supreme Court held in *Steagald v. United States*[10] that the police need a separate search warrant to enter the house of a third party to execute an arrest warrant.

The Andersons raise three arguments as to why the troopers' entry into their house violated the Fourth Amendment as construed in *Payton* and *Steagald.* First, the Andersons argue that even though the troopers had an arrest warrant for Daniel, the fact that the Maple Street house was also the Andersons' residence means that the troopers were required to obtain a separate search warrant before entering the house (to overcome the Andersons' right of privacy as co-residents). Second, the Andersons argue that even if the troopers could enter the

---

9. 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980).

10. 451 U.S. 204, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981).

house based solely on the authority of the arrest warrant for Daniel, the troopers lacked probable cause to believe that Daniel was currently inside the house. And third, the Andersons argue that even if *Payton* and *Steagald* authorize police entry into a shared residence based solely on an arrest warrant for one of the residents, and even if the troopers had probable cause to believe that Daniel was inside, the troopers nevertheless violated *Steagald* by entering the Andersons' personal bedroom without obtaining a separate warrant authorizing their entry into that part of the house.

We address these contentions in turn.

The Andersons concede that their situation is a "blend" of the facts in *Payton* and the facts in *Steagald*—because their son Daniel was sharing a residence with them. Moreover, the record shows that the authorities were aware that Daniel was living with his parents on Maple Street. In Daniel's required monthly reports to his probation officer, he listed his parents' house as his residence. And, as we noted earlier in this opinion, when Sergeant Valerio visited the Andersons' house around one o'clock in the morning on March 25th, looking for Daniel, Lana Anderson told Valerio that Daniel lived with her and her husband, although he slept on the couch.

Thus, to the extent that *Payton* requires the police to have probable cause to believe that the particular building they are about to enter is, in fact, the residence of the person named in the arrest warrant, this requirement was satisfied.

■ Neither *Payton* nor *Steagald* directly answers the question of whether the United States Constitution requires a separate warrant when the suspect named in the arrest warrant shares a residence with third parties. However, we conclude that the troopers' authority to enter the house under the authority of the arrest warrant is not affected by the fact that Daniel shared this residence with his parents.

The language of *Payton* is broad enough to support the conclusion that the warrant for Daniel's arrest was sufficient to authorize the entry: "[F]or Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling *in which the suspect lives* when there is reason to believe the suspect is within." *Payton,* 445 U.S. at 603, 100 S.Ct. at 1388 (emphasis added). But this issue was not squarely presented in *Payton* or in its companion case, *Riddick v. New York.* Thus, the Supreme Court's language can not be taken as a ruling on the question of what the Fourth Amendment requires when two or more adults share a residence.

Professor LaFave appears to take the position, presumably based on the breadth of *Payton's* language, that an arrest warrant, standing alone, is sufficient to authorize the police to enter all portions of a residence where the suspect might be concealed, regardless of whether other people live in the residence too.[11] This position finds support in the dissent in *Steagald,* which proceeds from the premise that *Payton* authorizes a police entry into a suspect's home based on an arrest warrant alone, even when the suspect does not live alone:

> *Payton* makes clear that an arrest warrant is all that is needed to enter the suspect's "home" to effect the arrest.... If a suspect has been living in a particular dwelling for any significant period, say a few days, it can certainly be considered his "home" for Fourth Amendment purposes, *even if the premises are owned by a third party and others are living there* .... In such a case[,] the police could enter the premises with only an arrest warrant.

*Steagald v. United States,* 451 U.S. at 230–31, 101 S.Ct. at 1657 (Rehnquist, J., dissenting) (emphasis added).

■ Case law from around the country supports the view that, in situations like the Andersons' case, an arrest warrant alone

---

**11.** *See* Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* (4th ed.2004), § 6.1(b), Vol. 3, p. 279. Professor LaFave does not discuss the issue directly, but he notes that when, despite probable cause to believe that the suspect is within the residence, it turns out that the suspect is not there, "other occupants will consequently sometimes have their privacy intruded upon".

(coupled with a reasonable belief that the person named in the warrant is currently in the residence) authorizes the police to enter the suspect's own home to execute the warrant, regardless of whether the suspect has co-residents.[12] The suspect need not be the owner of the dwelling.[13]

We, too, adopt this view of the law. Accordingly, because the troopers had a warrant for Daniel Anderson's arrest, the troopers needed no additional warrant to enter the residence that Daniel shared with his parents, so long as the troopers had probable cause to believe that Daniel was inside that residence.

■ (The *Payton* decision refers to a requirement that the police have "reason to believe" that the person named in the warrant is inside the building, but *Payton* does not specify whether this "reason" needs to rise to the level of probable cause or, alternatively, need merely be a reasonable suspicion.[14] However, regardless of the federal test, the search and seizure provision of the Alaska Constitution (Article I, Section 14) requires the police to have probable cause in this situation. *See Davenport v. State*, 568 P.2d 939, 949 (Alaska 1977), and *Taylor v.*

*State*, 642 P.2d 1378, 1383 (Alaska App. 1982).)

■ We therefore turn to the question of whether the troopers had probable cause to believe that Daniel Anderson was inside the residence when they made their entry on the evening of March 26th.

Viewing the facts in the light most favorable to the superior court's ruling, we conclude that the troopers had probable cause to believe that Daniel was inside the house.

As we explained above, the authorities had probable cause to believe that Daniel was residing with his parents at the Maple Street address. And, as Professor LaFave notes, probable cause to believe that a suspect is in his own home can arise "as a matter of inference from a lack of information indicating [that] the defendant is elsewhere."[15]

It is true (as the Andersons point out) that, in the petition to revoke Daniel's probation, his probation officer declared that Daniel's whereabouts were currently "unknown" (although the petition listed the Maple Street house as Daniel's last known address). But the question is not whether there was proba-

12. *Case v. Kitsap County Sheriff's Dep't*, 249 F.3d 921, 925, 930–31 (9th Cir.2001) (holding that police armed with an arrest warrant and a reasonable belief that the subject of the warrant resided in a given dwelling and was present in the home at the time police sought to execute the warrant could forcibly enter the house despite knowledge that a co-resident was present); *United States v. Lovelock*, 170 F.3d 339, 345 (2d Cir.1999) ("[T]he requirement [under *Payton*] that the person named in an arrest warrant open his doors to the officers of the law ... does not allow a house-mate to keep those doors shut." (internal citation and quotation omitted)); *United States v. Litteral*, 910 F.2d 547, 553 (9th Cir. 1990) ("[I]f the suspect is a co-resident of [a] third party, then *Steagald* does not apply, and *Payton* allows both arrest of the subject of the arrest warrant and use of evidence found against the third party."); *Washington v. Simpson*, 806 F.2d 192, 196 (8th Cir.1986) (upholding the entry by police into a person's residence to arrest a co-resident who is the subject of an arrest warrant); *People v. White*, 117 Ill.2d 194, 111 Ill.Dec. 288, 512 N.E.2d 677, 679, 683, 686 (1987) (upholding the trial court's conclusion that the suspect's "home" for Fourth Amendment purposes was his brother's residence, where the suspect had been residing for at least seven days and appeared to intend to reside indefinitely, and, therefore, po-

lice needed an arrest warrant to enter the premises); *Morgan v. State*, 963 S.W.2d 201, 204 (Tex.App.1998) (holding that an arrest warrant alone authorized police to enter a motel room that was registered to Morgan's sister where the police had reason to believe that Morgan was living there and that he was presently inside); *Barnes v. Commonwealth*, 234 Va. 130, 360 S.E.2d 196, 200 (1987) (The police "had reason to believe that Barnes was staying in [his stepfather's] apartment and was actually present, and the arrest warrants [for Barnes] gave them the limited authority to enter the apartment, search for the person described in the warrants, and arrest him.").

13. *United States v. Risse*, 83 F.3d 212, 217 (8th Cir.1996) (citing *Steagald v. United States*, 451 U.S. 204, 230–31, 101 S.Ct. 1642, 1657, 68 L.Ed.2d 38 (1981) (Rehnquist, J., dissenting)).

14. *Payton*, 445 U.S. at 603, 100 S.Ct. at 1388. See also the discussion of this point in Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* (4th ed.2004), § 6.1(a), Vol. 3, p. 265 n. 18.

15. Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* (4th ed.2004), § 6.1(b), Vol. 3, p. 282.

ble cause to believe that Daniel was inside the Maple Street house at the time that Daniel's probation officer filed the petition to revoke his probation on March 25th. Instead, the question is whether the troopers had probable cause to believe that Daniel was inside the house when they entered the house on the evening of March 26th.

When Sergeant Valerio and the Alaska State Troopers arrived at the Andersons' residence to serve the warrant for Daniel's arrest, they could see the car that Daniel normally drove—the blue Chevrolet registered to Lars Anderson—parked outside the house.

In addition, because the probation office had earlier received a telephone call from Daniel in which he claimed that he was "at a friend's house in the Flats", the police had gone to a residence in Bells Flats, but Daniel was not there. And the troopers were following another tip—that Daniel was at a house at 323 Maple Street—when they happened to see Daniel's car parked at 415 Maple Street.

Thus, the fact that the troopers were able to rule out Daniel's presence at two other addresses, coupled with the fact that his car was parked outside the home at 415 Maple Street, strengthened the inference that Daniel was currently inside this residence.

Finally, the events that transpired after the troopers and Sergeant Valerio arrived at 415 Maple Street bolstered the conclusion that Daniel was inside this residence. As we explained earlier, the troopers knocked loudly on the doors, windows, and walls for approximately 20 minutes, with no response. The trooper dispatcher called the house several times and left messages informing the Andersons that the troopers were outside, seeking to arrest Daniel, but nobody picked up the telephone or came to the door. Valerio saw a young child peek out through a window, and then saw someone pull the child back behind drawn blinds. In addition, the troopers could hear music playing inside the house—and, after one of the troopers shouted that they had a warrant for Daniel's arrest, someone inside the house turned up the volume of this music.

Given all of these circumstances, the troopers had probable cause to believe that Daniel was inside the Maple Street house when they made their forcible entry to serve the arrest warrant. And because this house was Daniel's residence, both the Fourth Amendment and Article I, Section 14 of the Alaska Constitution were satisfied.

*The troopers did not need a separate warrant to enter Lars and Lana Anderson's bedroom at the back of the house*

■ The Andersons argue in the alternative that, even if the troopers had probable cause to believe that Daniel was currently inside the house, this would only authorize the troopers to enter and search the areas of the house that belonged to Daniel or that Daniel shared in common with his parents. As we explained early in this opinion, the troopers went to the back of the house and found Daniel hiding in his parents' bedroom. The Andersons assert that their personal bedroom was a part of the house that they used to the exclusion of Daniel, and that therefore the troopers needed a separate warrant before entering that room.

The Andersons' argument finds little support in *Payton*. The language of the *Payton* decision strongly indicates that the Supreme Court viewed the act of crossing the threshold as the crucial event for Fourth Amendment purposes. Writing for the Court, Justice Stevens declared that "*physical entry of the home* is the chief evil against which the wording of the Fourth Amendment is directed" (emphasis added), and that "the Fourth Amendment has drawn a firm line at the entrance to the house". *Payton*, 455 U.S. at 585–86 & 590, 100 S.Ct. at 1379–1380 & 1382.

In post-*Payton* decisions, courts have concluded that the strict Fourth Amendment protection afforded to residents at the threshold of their abode does not extend to the separate rooms within the home. For example, in *United States v. Pallais,* the Seventh Circuit held that "[u]nder *Payton,* police armed with an arrest warrant can search the entire residence of the person named in the warrant in order to execute

it."[16] And as Justice Rehnquist noted in his dissent in *Steagald*, even though the police are not allowed to conduct an unlimited search of the residence, they are permitted to "search ... those areas in which the object of the search might hide".[17]

 According to Professor LaFave, courts have consistently endorsed this view of *Payton:* when there has been a lawful entry into a dwelling pursuant to an arrest warrant, courts uphold police searches of the premises for the person named in the warrant so long as the search is limited to the places where the suspect could hide.[18]

We conclude that this is the proper rule. As explained above, the main concern of *Payton* is the crossing of the threshold into a residence. Moreover, even though the individual residents of a multi-resident dwelling have a privacy interest in their personal spaces within the residence, this right of privacy is abridged to only a limited degree, because the search authorized by *Payton* is strictly limited in scope. The police are limited to searching for the presence of the person named in the warrant. Thus, the officers are not empowered to search small spaces, drawers, or closed containers (unless those containers happen to be large enough to conceal a person).

Finally, it seems to us that the rule proposed by the Andersons is unreasonable. When the police enter a residence to effect an arrest under the authority of a warrant, it seems neither just nor practical to allow the suspect to run into someone else's bedroom and then claim sanctuary there.

For these reasons, we conclude that neither the Fourth Amendment nor Article I, Section 14 of the Alaska Constitution required the troopers to obtain a separate warrant to enter the bedroom of Lars and Lana Anderson.

*Conclusion*

When the Andersons harbored and concealed their son Daniel, and when they lied to the troopers about Daniel's whereabouts, knowing that the authorities were attempting to arrest Daniel for violating his felony probation, and acting with the intent to hinder his punishment, the Andersons committed first-degree hindering prosecution as defined in AS 11.56.770(a)(1).

Because the troopers had a warrant for Daniel's arrest, because they knew that Daniel resided with his parents at 415 Maple Street, and because they had probable cause to believe that Daniel was currently within that residence, the troopers acted lawfully when they entered the residence to arrest Daniel.

Finally, the troopers needed no separate warrant to enter the Andersons' personal bedroom to search for Daniel.

Accordingly, the judgements of the superior court are AFFIRMED.

---

**16.** *United States v. Pallais*, 921 F.2d 684, 691 (7th Cir.1990), cited in Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* (4th ed.2004), § 6.1(b), Vol. 3, p. 279 n. 66.

**17.** *Steagald v. United States*, 451 U.S. at 226, 101 S.Ct. at 1655 (Rehnquist, J., dissenting).

**18.** Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* (4th ed.2004), § 6.3(a), Vol. 3, pp. 345–46 & n. 6.