IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

September 2022 Term

_____

No. 21-0396

_____

STATE OF WEST VIRGINIA,
Respondent,

v.

TRACY PENNINGTON,
Petitioner.

FILED

**November 14, 2022**

released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

_____

Appeal from the Circuit Court of Jackson County
The Honorable Lora A. Dyer Judge
Criminal Action No. 19-F-83

AFFIRMED

_____

Submitted: September 27, 2022
Filed: November 14, 2022

Roger L. Lambert, Esq.                     Patrick Morrisey, Esq.
Hurricane, West Virginia                   Attorney General
Counsel for Petitioner                     Katherine M. Smith, Esq.
                                           Assistant Attorney General
                                           Charleston, West Virginia
                                           Counsel for Respondent

CHIEF JUSTICE HUTCHISON delivered the Opinion of the Court.

JUSTICE WOOTON dissents and reserves the right to file a dissenting opinion.

**SYLLABUS BY THE COURT**

1. "When reviewing a ruling on a motion to suppress, an appellate court should construe all facts in the light most favorable to the State, as it was the prevailing party below. Because of the highly fact-specific nature of a motion to suppress, particular deference is given to the findings of the circuit court because it had the opportunity to observe the witnesses and to hear testimony on the issues. Therefore, the circuit court's factual findings are reviewed for clear error." Syl. Pt. 1, *State v. Lacy*, 196 W. Va. 104, 468 S.E.2d 719 (1996).

2. "In contrast to a review of the circuit court's factual findings, the ultimate determination as to whether a search or seizure was reasonable under the Fourth Amendment to the United States Constitution and Section 6 of Article III of the West Virginia Constitution is a question of law that is reviewed *de novo*. . . . Thus, a circuit court's denial of a motion to suppress evidence will be affirmed unless it is unsupported by substantial evidence, based on an erroneous interpretation of the law, or, based on the entire record, it is clear that a mistake has been made." Syl. Pt. 2, in part, *State v. Lacy*, 196 W. Va. 104, 468 S.E.2d 719 (1996).

3. Law enforcement executing a valid arrest warrant may lawfully enter a residence if they have reason to believe that the subject of the warrant lives there and is presently within. Reason to believe requires less proof than probable cause and is established by evaluating the totality of the circumstances.

i

**HUTCHISON, Chief Justice**:

Petitioner Tracy Pennington entered a conditional guilty plea to one count of child concealment following the Circuit Court of Jackson County's denial of her motion to suppress evidence that her minor child, who had been adjudicated as a status offender for truancy and placed in a temporary guardianship with her grandparents in a neighboring county, was discovered by law enforcement in petitioner's home after absconding from her grandparents' supervision five months earlier. At issue in this appeal is whether the officers' entry into the residence for the exclusive purpose of executing a lawful juvenile "pick-up" order violated petitioner's constitutional right against unreasonable search and seizure such that the evidence obtained as a result of the search of the residence should have been suppressed.

Upon review of the parties' briefs, appendix record, oral argument, and applicable legal authority, and for the reasons stated below, we find no error and affirm the circuit court's decision to deny petitioner's motion to suppress.

### I.    Factual and Procedural Background

Juvenile S.W. was adjudicated as a status offender for truancy on July 30, 2018. By order entered November 5, 2018, it was agreed that, as a lesser restrictive alternative to out-of-home placement, S.W. would be placed with her paternal grandparents, as temporary guardians, in Kanawha County, West Virginia, where she would attend school. Petitioner's parental rights to S.W. remained intact. After being

1

placed with her grandparents, on December 7, 2018, S.W. left their residence, without permission, and was no longer attending school.

By order entered January 11, 2019, upon consideration of the State's motion and verified petition that S.W., who was then sixteen years old, was an "active runaway, whose current whereabouts are unknown[,]" the circuit court determined that there was probable cause to believe that S.W.'s health, safety, and welfare demanded that she be taken into custody, in accordance with West Virginia Code § 49-4-705(a)(2)[1], and it ordered that she be taken into custody forthwith and placed in the State's custody for placement in a staff-secured facility pending further hearings. This order is commonly referred to as a "pick-up" order.

Until she was temporarily removed from petitioner's custody in November 2018, S.W. resided with petitioner and G.W., S.W.'s father, in petitioner's apartment on Klondyke Street in Ripley, West Virginia. After S.W. absconded from her grandparents' home in December, Department of Health and Human Resources (DHHR) worker Carey

---

[1] West Virginia Code § 49-4-705 provides:

> (a) In proceedings formally instituted by the filing of a juvenile petition, the circuit court or a magistrate may issue an order directing that a juvenile be taken into custody before adjudication only upon a showing of probable cause to believe that one of the following conditions exists: . . . (2) the health, safety and welfare of the juvenile demand custody. . . . A detention hearing pursuant to section seven hundred six of this article shall be held by the judge or magistrate authorized to conduct the hearings without unnecessary delay and in no event may any delay exceed the next day.

Blackhurst spoke with petitioner and G.W. by phone and, on several occasions, attempted to locate S.W. by going to petitioner's apartment. Also on occasion, DHHR workers received tips that S.W. had been seen at petitioner's apartment or at her maternal grandparents' house, which was located nearby. Ms. Blackhurst's efforts to locate S.W. were unsuccessful. Law enforcement's repeated efforts to locate S.W. at petitioner's apartment were equally unavailing.

On May 16, 2019, by which time S.W. had been missing for more than five months, Jackson County Sheriff's Deputy Ben DeWees was advised by his superior, Chief Deputy R. H. Mellinger, that, at approximately 8:30 p.m., he received a tip from a woman who not only saw S.W. at petitioner's apartment, but who was also informed by petitioner that she intended "to keep [S.W.] hidden until she was 18, so all this juvenile stuff would go away." Chief Deputy Mellinger advised Deputy DeWees that his source concerning S.W.'s whereabouts was credible. Upon receiving this information from his superior, and with the knowledge that S.W. was the subject of a "pick-up" order, Deputy DeWees contacted the Jackson County Prosecuting Attorney to determine whether a search warrant was also required to enter petitioner's apartment in order to execute the "pick-up" order. According to Deputy DeWees, Prosecuting Attorney Katie Franklin advised him that a search warrant was not required. Deputy DeWees also contacted two other law enforcement officers, West Virginia State Troopers M.P. Fannin and J.M. Comer, whom he knew had been to petitioner's apartment earlier in the evening in an unsuccessful attempt to speak with petitioner on an unrelated criminal matter. The officers returned to petitioner's apartment and joined Deputy DeWees as he knocked on the door. Although

3

footsteps could be heard from inside the apartment, no one answered the door. After explaining the purpose of their visit to petitioner's landlord, who lived next door, Deputy DeWees obtained a key to the apartment.

Using the key, the officers entered the apartment and encountered petitioner and G.W. lying on the bed in one of the bedrooms.[2] Petitioner and G.W. denied that S.W. was in the apartment. The officers eventually proceeded to the second bedroom, where they found S.W. hiding inside a hollowed-out chest of drawers that had been placed against the wall. The officers took S.W. into custody pursuant to the pick-up order. Deputy DeWees also arrested both petitioner and G.W. for "child concealment," in violation of West Virginia Code § 61-2-14d[3], because of "[t]he way [S.W.] was hidden in the room." Petitioner and G.W. were subsequently indicted on felony charges of "child concealment" and conspiracy to commit that offense, in violation of West Virginia Code § 61-10-31.[4]

---

[2] The body camera video footage taken by Deputy DeWees of the search of petitioner's apartment was made a part of the appendix record and viewed by the Court in connection with this appeal.

[3] West Virginia Code § 61-2-14d provides, in relevant part, as follows:

> (a) Any person who conceals, takes or removes a minor child in violation of any court order and with the intent to deprive another person of lawful custody or visitation rights shall be guilty of a felony, and, upon conviction thereof, shall be imprisoned in the penitentiary not less than one nor more than five years, or in the discretion of the court, shall be imprisoned in the county jail not more than one year or fined not more than one thousand dollars, or both fined and imprisoned.

[4] West Virginia Code § 61-10-31 provides, in relevant part, as follows:

Continued . . .

On August 20, 2019, petitioner filed a motion to suppress "any and all evidence obtained as a result of the illegal, warrantless search of [petitioner's] home" – i.e., evidence that S.W. was concealed in the home. A suppression hearing was conducted on May 18, 2020, at which Ms. Blackhurst, the DHHR caseworker, and Deputy DeWees testified consistently with the facts as set forth above. Deputy DeWees clarified that the sole purpose for entering petitioner's apartment was to execute the "pick-up" order for S.W. out of concern for her because "[w]e didn't know where she was"; that he did not intend to charge petitioner with a crime in the event S.W. was found in the home; but that petitioner and G.W. were ultimately arrested because of "[t]he way [S.W.] was hidden in the room." By order entered on August 6, 2020, the circuit court denied petitioner's motion.

Petitioner thereafter entered into a plea agreement pursuant to which she pled guilty to the offense of "child concealment"; the State agreed to dismiss the count of conspiracy.[5] Under the terms of the plea agreement, petitioner retained the right to appeal any prior pretrial evidentiary rulings of the circuit court. She was sentenced to a period of

---

It shall be unlawful for two or more persons to conspire (1) to commit any offense against the State or (2) to defraud the State, the state or any county board of education, or any county or municipality of the State, if, in either case, one or more of such persons does any act to effect the object of the conspiracy.

[5] Additionally, the plea agreement provided that the State would dismiss one count of "obtaining money by false pretenses," one count of "forgery," and one count of "uttering," for which petitioner was indicted in connection with an unrelated criminal matter.

incarceration of one to five years, with such sentence being suspended, and was placed on

probation for a period of four years. This appeal followed.

## II. Standard of Review

The issue on appeal is whether the circuit court erred in denying petitioner's

motion to suppress the evidence obtained as a result of the search of her home.

> When reviewing a ruling on a motion to suppress, an
> appellate court should construe all facts in the light most
> favorable to the State, as it was the prevailing party below.
> Because of the highly fact-specific nature of
> a motion to suppress, particular deference is given to the
> findings of the circuit court because it had the opportunity to
> observe the witnesses and to hear testimony on the issues.
> Therefore, the circuit court's factual findings are reviewed for
> clear error.
>
> In contrast to a review of the circuit court's factual
> findings, the ultimate determination as to whether a search or
> seizure was reasonable under the Fourth Amendment to the
> United States Constitution and Section 6 of Article III of the
> West Virginia Constitution is a question of law that is
> reviewed *de novo.* . . . Thus, a circuit court's denial of
> a motion to suppress evidence will be affirmed unless it is
> unsupported by substantial evidence, based on an erroneous
> interpretation of the law, or, based on the entire record, it is
> clear that a mistake has been made.

Syl. Pts. 1 and 2, in part, *State v. Lacy*, 196 W. Va. 104, 468 S.E.2d 719 (1996). With these

standards in mind, we now consider the parties' arguments.

## III. Discussion

The Fourth Amendment to the United States Constitution provides that

citizens have the right "to be secure in their persons, houses, papers, and effects, against

6

unreasonable searches and seizures[.]"[6] It protects against certain kinds of government intrusions, most particularly, "the physical entry of the home by law enforcement."[7] However, in *Payton v. New York*, 445 U.S. 573, 603 (1980), the Supreme Court held that "for Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the [subject of the warrant] lives when there is reason to believe the [subject] is within." Indeed, where authorities have a valid arrest warrant, "it is constitutionally reasonable to require [the subject] to open his doors to the officers of the law." *Id.* at 602-03.[8] The parties agree that the "pick-up" order directing that S.W. be taken into custody and placed with the DHHR, which was founded upon probable cause to believe that her "health, safety and welfare" demanded it, *see* W.

---

[6] This federal right to be free from unreasonable search and seizure applies to the states through the Fourteenth Amendment. *See Payton v. New York*, 445 U.S. 573, 576 (1980) (citing *Mapp v. Ohio*, 367 U.S. 643 (1961)). *See also State v. Duvernoy*, 156 W. Va. 578, 582, 195 S.E.2d 631, 634 (1973) ("Article III, Section 6 of the West Virginia Constitution is very similar to the Fourth Amendment" and has been traditionally construed in harmony with the Fourth Amendment).

[7] *State v. Snyder*, 245 W. Va. 42, 47, 857 S.E.2d 180, 185 (2021) (citing *Payton v. New York*, 445 U.S. 573, 585-86 (1980)).

[8] To be clear, the subject of the pick-up order was S.W., but the Fourth Amendment claim in this case was raised by petitioner, who was not named in the pick-up order but whose indictment and guilty plea were based on evidence uncovered during the officers' search of her residence for S.W. In *Steagald v. U.S.*, 451 U.S. 204 (1981), the Supreme Court held that, absent exigent circumstances or consent, "under the Fourth Amendment, a law enforcement officer may not legally search for the subject of an arrest warrant in the home of a third party without first obtaining a search warrant." *Id.* at 205-06. Because we conclude that there was a reasonable belief that S.W. resided with petitioner, *see infra.*, petitioner's apartment was not "the home of a third party" and, therefore, *Steagald* does not apply.

7

Va. Code § 49-4-705(a)(2), was the functional equivalent of an arrest warrant[9] and was lawfully issued.

At issue here is whether petitioner's Fourth Amendment protection against unreasonable search and seizure was violated when the officers entered her apartment to execute the pick-up order for S.W. The *Payton* standard for executing a valid arrest warrant (or, in this case, a valid "pick-up" order) has been interpreted as requiring a two-part inquiry: "first, there must be a reasonable belief that the location to be searched is the [subject's] dwelling, and second, the police must have 'reason to believe' that the [subject] is within the dwelling."[10] Petitioner contends that *Payton's* "reasonable belief" standard requires that law enforcement have "probable cause" that S.W. was both living at the apartment and would be there when they entered because that interpretation "is most consistent with the special protections that the Constitution affords to the home." *United States v. Brinkley*, 980 F.3d 377, 385 (4th Cir. 2020).[11] *See id.* (observing that "*Payton* itself reiterated that 'the physical entry of the home is the chief evil against which the wording

_____

[9] *See State v. Ellsworth*, 175 W. Va. 64, 70, 331 S.E.2d 503, 509 (1985) (stating that "the term 'custody' as used in [formerly] W. Va. Code, 49-5-8 [now 49-4-705] . . . is equivalent to an arrest, that is, it must be based upon probable cause . . . .").

[10] *United States v. Magluta*, 44 F.3d 1530, 1533 (11th Cir. 1995); *accord Valdez v. McPheters*, 172 F.3d 1220, 1224 (10th Cir. 1999); *United States v. Risse*, 83 F.3d 212, 216 (8th Cir. 1996); *United States v. Lauter*, 57 F.3d 212, 215 (2nd Cir. 1995).

[11] *Accord United States v. Gorman*, 314 F.3d 1105 (9th Cir. 2002); *United States v. Vasquez-Algarin*, 821 F.3d 467 (3rd Cir. 2016).

of the Fourth Amendment is directed'" (quoting *Payton*, 445 U.S. at 585)). [12] According to petitioner, the facts and circumstances surrounding the officers' entry and search of her home did not meet that heightened standard, emphasizing that the officers were not entitled to rely on the uncorroborated tip of an unidentified informant concerning S.W.'s whereabouts.

The State counters that the appropriate quantum of proof for executing an arrest warrant is the less stringent standard of whether, under the totality of the circumstances available to the officers, the officers had a reasonable belief that S.W. was residing with petitioner in her home and was at the home at the time they entered. The State contends that the plain text of *Payton*, along with the holdings of a number of jurisdictions, support its argument, and that using common sense and viewing the situation in the totality, the officers had reason to believe that S.W. both lived at, and would be present in, petitioner's apartment at the time they entered. We agree.

The issue of what quantum of proof is necessary to satisfy the reason to believe standard in the context of executing a lawful arrest warrant has been frequently debated, with multiple courts construing it as being "satisfied by something less than would be required for a finding of 'probable cause.'" *United States v. Thomas,* 429 F.3d 282, 286

---

[12] Several state courts have held that, under their respective state constitutional search and seizure provisions, the reason to believe standard means there must be probable cause to believe the subject of the arrest warrant lives in the dwelling and is within. *See e.g.*, *State v. Hatchie*, 166 P.3d 698 (Wash. 2007); *Anderson v. State*, 145 P.3d 617 (Alaska Ct. App. 2006); *State v. Jones*, 27 P.3d 119 (Oregon 2001).

(D.C. Cir. 2005).[13] In view of the plain text of *Payton* – that an officer with "an arrest warrant founded on probable cause" has "the limited authority to enter a dwelling in which the [subject of the warrant] lives when there is reason to believe the [subject] is within"[14] – it is clear that the Supreme Court "used a phrase other than 'probable cause' because it meant something other than 'probable cause.'" *Thomas*, 429 F.3d at 286; *accord United States v. Magluta*, 44 F.3d 1530, 1534 (11th Cir. 1995) (stating that "[t]he strongest support for a lesser burden than probable cause remains the text of *Payton*, and what we must assume was a conscious effort on the part of the Supreme Court in choosing the verbal formulation of 'reason to believe' over that of 'probable cause.'"). Indeed, the Court's use of "probable cause" in *Payton* to "describe[e] the foundation for an arrest warrant[,] and its use of 'reason to believe' [to] describ[e] the basis for the authority to enter a dwelling[,] shows that the Court intended different standards for the two." *United States v. Pruitt*, 458 F.3d 477, 484 (6th Cir. 2006); *see also Barrett v. Commonwealth*, 470 S.W.3d 337, 342 (Ky. 2015) ("[i]n setting forth the rule in *Payton*, the Supreme Court required the arrest warrant to be 'founded on probable cause,' yet set [']reason to believe['] as the standard to justify entry. Therefore, the Court was clearly aware of the differences and chose to require

---

[13] *Accord United States v. Pruitt*, 458 F.3d 477, 482 (6th Cir. 2006); *Valdez*, 172 F.3d at 1225; *United States v. Route*, 104 F.3d 59, 62 (5th Cir. 1997); *Risse*, 83 F.3d at 216; *Lauter*, 57 F.3d at 215; *Magluta*, 44 F.3d at 1535; *Barrett v. Commonwealth*, 470 S.W.3d 337, 342 (Ky. 2015); *Duran v. State*, 930 N.E.2d 10, 15-16 (Ind. 2010); *State v. Chavez*, No. 27840, 2018 WL 5310268 (Ohio Ct. App. 2018); *Brown v. U.S.*, 932 A.2d 521 (D.C. Ct. App. 2007).

[14] 445 U.S. at 603.

10

separate standards.").[15] As one court also explained, "a reasonable ground for belief of guilt" (that is, probable cause for the issuance of an arrest warrant) is not the "grammatical analogue to a reasonable belief that an individual is located within a premises subject to search. These are two entirely different inquiries." *Pruitt*, 458 F.3d at 484.[16]

The less stringent "reason to believe" standard is "established by looking at common sense factors and evaluating the totality of the circumstances and requires less proof than does the probable cause standard." *Barrett*, 470 S.W.3d at 342. Stated another way, an in-home search for the subject named in an arrest warrant is lawful where "the

---

[15] The Supreme Court's awareness and use of the different standards was specifically noted in *Maryland v. Buie*, 494 U.S. 325 (1990), in the context of the justification of a protective sweep. The Court stated that the Court of Appeals of Maryland "applied an unnecessarily strict Fourth Amendment standard" when it "require[ed] a protective sweep to be justified by probable cause to believe that a serious and demonstrable potentiality for danger existed." *Id.* at 337. Rather, the Court explained, "[t]he Fourth Amendment permits a properly limited protective sweep in conjunction with an in-home arrest when the searching officer possesses a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Id.* Thus, as *Buie* demonstrates, the "Court does not use the terms probable cause and reasonable belief interchangeably, but rather that it considers reasonable belief to be a less stringent standard than probable cause." *Pruitt*, 458 F.3d at 484.

[16] Additionally, by obtaining an arrest warrant, officers have already demonstrated probable cause to a neutral magistrate. *See Magluta*, 44 F.3d at 1534-35 ("Reasonable belief embodies the same standards of reasonableness [as probable cause] but allows the officer, who has already been to the magistrate to secure an arrest warrant, to determine that the suspect is probably within certain premises without an additional trip to the magistrate" (internal quotations omitted).); *Barrett*, 470 S.W.3d at 343 ("[T]he rights of suspects will be adequately protected by using th[e] [reasonable belief] standard. When police execute a valid arrest warrant, a neutral and detached magistrate has already made a probable cause evaluation that the suspect has committed a crime. It would be overly burdensome for police to make a second probable cause determination when executing a valid arrest warrant.").

11

facts and circumstances within the knowledge of the law enforcement agents, when viewed in the totality, . . . warrant a reasonable belief that the location to be searched is the [arrestee's] dwelling, and that the [arrestee] is within the residence of the time of entry." *Magluta*, 44 F.3d at 1535. "[T]he appropriate test is whether the facts known to the officers, taken as a whole, gave them objectively reasonable grounds to believe that the [subject of the arrest warrant] lived at the apartment." *People v. Downey*, 130 Cal. Rptr.3d 402, 409 (Cal. Ct. App. 2011). For example, although the subject of an arrest warrant "'may live somewhere else from time to time does not categorically prevent a dwelling from being the [subject's] residence[,]'[b]ut the officers' belief that the searched home is the [subject's] residence must be reasonable at the time of entry into the home." *Payton v. City of Florence, Ala.*, 413 Fed. Appx. 126, 131 (11th Cir. 2011) (quoting *United States v. Bennett*, 555 F.3d 962, 965 (11th Cir.), *cert denied*, 558 U.S. 831 (2009)). As for law enforcement's "on the spot determination" as to whether the subject is inside the residence at the time, "'courts must be sensitive to common sense factors indicating a resident's presence[,]'" *United States v. Bervaldi*, 226 F.3d 1256, 1263 (11th Cir. 2000) (quoting *Magluta*, 44 F.3d at 1535), such as the presence of an automobile parked outside the residence. *See State v. Slaman*, 189 W. Va. 297, 299, 431 S.E.3d 91, 93 (1993) ("the two officers reasonably believed that one of the suspects, [Maria] Luciano, . . . could be inside the mobile home. . . . [because] they noticed an automobile with a vanity license plate with 'Maria 2' on it").[17]

---

[17] The State contends that we have previously determined the appropriate standard to be "reason to believe" and that our decision in *State v. Slaman*, 189 W. Va. 297, 431 S.E.2d 91 (1993), is controlling. In *Slaman*, officers visited the defendant's home in order

Continued . . .

The time of day has also been held to be sufficient. *See Thomas*, 429 F.3d at 286 ("[T]he early morning hour was reason enough" for officers to have reason to believe the arrestee would be home when they executed the warrant); *United States v. May*, 68 F.3d 515, 516 (D.C. Cir. 1995) ("[T]he logical place one would expect to find [the arrestee] on that . . . morning was at his home"); *United States v. Terry*, 702 F.2d 299, 319 (2d Cir. 1983) (holding that "agents arrived at the apartment at 8:45 A.M. on a Sunday morning, a time

to execute arrest warrants for the defendant and his girlfriend. *See id.* at 298, 431 S.E.2d at 92. The officers were advised by a neighbor that the girlfriend, Maria Luciano, should be home at that time of day; a vehicle parked outside the residence with the license plate "Maria 2" also suggested that she was at home. *See id.* The officers entered the home through an unlocked door and observed a purse and a blanket tossed on the couch, which suggested that someone was inside the home. *See id.* Although Ms. Luciano was not found there, an inspection of the home revealed marijuana plants growing in a fish aquarium that was found on the floor. *See id.* The plants were later seized pursuant to a subsequently obtained search warrant. *See id.* After he was indicted on the charge of manufacturing a controlled substance, the defendant moved to suppress the evidence obtained as a result of the initial search of the home. *See id.* at 299, 431 S.E.2d at 93. The motion was denied, and the defendant was subsequently convicted of the crime charged. *See id.* On appeal, the defendant argued that the initial search of his home was an unreasonable violation of his constitutional rights, and that the evidence ultimately seized as a result of that search was inadmissible, because "the officers lacked the requisite probable cause and exigent circumstances to justify the illegal entry and search." *Id.*

In affirming the circuit court's ruling and defendant's conviction, we emphasized that the officers were at the home to execute arrest warrants and, "[g]iven their authority, [they] acted reasonably in entering the unlocked . . . home. . . . [T]he two officers reasonably believed that one of the suspects, . . . whom they were looking for, could be inside. . . .and they had the legal authority to look and see if she was within the . . . home." *Id.* at 299-300, 431 S.E.2d at 93-4.

While our conclusion in *Slaman* is wholly consistent with our holding in this case, we acknowledge that the decision did not include an analysis of *Payton* or a clear explanation as to why a reasonable belief that Ms. Luciano was present in the home was sufficient for entry. Thus, although *Slaman* clearly lends support to our holding in the present case, we do not exclusively rely on it as the final word on the issue presented herein.

13

when they could reasonably believe that [the subject] would be home"); *Magluta*, 44 F.3d at 1535 ("[O]fficers may presume that a person is at home at certain times of the day – a presumption which can be rebutted by contrary evidence regarding the [arrestee's] known schedule"). Officers may also "take into consideration the possibility that the resident may be aware that police are attempting to ascertain whether or not the resident is at home[.]" *Id.* The circumstances of the subject's employment may also be relevant. *See Lauter*, 57 F.3d at 215 (information given to police that the subject "was unemployed and typically slept late" supported "a reasonable belief that [he] was present in the apartment when the warrant was executed"). "And the officers may consider an absence of evidence the suspect is elsewhere." *Valdez v. McPheters*, 172 F.3d 1220, 1226 (10th Cir. 1999). "No single factor is, of course, dispositive." *Id.*

Based upon all of the foregoing, we now hold that law enforcement executing a valid arrest warrant may lawfully enter a residence if they have reason to believe that the subject of the warrant lives there and is presently within. Reason to believe requires less proof than probable cause and is established by evaluating the totality of the circumstances.[18]

_____

[18] Petitioner contends that, because West Virginia is within the jurisdiction of the Fourth Circuit, this Court should adopt the probable cause standard consistent with that court's holding in *United States v. Brinkley*, 980 F.3d 377 (4th Cir. 2020); however, we decline to do so for the reasons stated herein. Although "[t]his Court pays due deference and respect to opinions and analysis of the Fourth Circuit . . . . we are not bound to adopt [its] approach" on this issue. *State ex rel. Ford Motor Co. v. McGraw*, 237 W. Va. 573, 595, 788 S.E.2d 319, 341 (2016). *See also State ex rel. Johnson & Johnson Corp. v. Karl*,

Continued . . .

14

In applying our holding to this case, we find that in evaluating the unique facts and circumstances in the totality, law enforcement had a reasonable belief that S.W. resided with petitioner in her home and that S.W. was within the home at the time they entered for purposes of executing the pick-up order. S.W. was a child who, up until she was removed from petitioner's custody, lived with petitioner at her apartment. Indeed, S.W.'s placement with her grandparents was temporary, with petitioner's parental rights remaining intact. There was no evidence presented that S.W. had previously lived anywhere other than with her parents; therefore, it was certainly logical to believe that, after running away from her grandparents' supervision, S.W. would return to her mother's home. Given that S.W. had previously been seen at petitioner's apartment on several occasions during the course of the five-month period after she ran away, the sighting of S.W. on May 16, 2019, was reasonably believed by law enforcement to be credible. Further adding to the reliability of the information that S.W. was living with petitioner and was presently within the home was the informant's specific (and correct) knowledge that S.W. was the subject of juvenile proceedings and that petitioner, according to the informant, planned to conceal S.W. in the apartment until she reached the age of majority, when the juvenile proceedings would resolve. It was also proper for the officers to consider that S.W. was aware that they were looking for her and that she was attempting to conceal herself

220 W. Va. 463, 477 n.18, 647 S.E.2d 899, 913 n.18 (2007) ("While federal court opinions applying West Virginia law are often viewed persuasively, we are not bound by those opinions"), *superseded by statute as stated in J.C. by and through Michelle C. v. Pfizer, Inc.*, 240 W. Va. 571, 814 S.E.2d 234 (2018)).

within the home so as not to be found.[19] *See Magluta*, 44 F.3d at 1535. Moreover, the officers arrived at the home sometime after 8:30 p.m., a time of night that a child would ordinarily be at home. *See e.g.*, *id.* ("[O]fficers may presume that a person is at home at certain times of the day"). Because the officers had a reasonable belief, according to the totality of the circumstances, that S.W. lived with petitioner at her apartment and was within the apartment at the time they entered, we discern no error in the circuit court's denial of petitioner's motion to suppress.

## IV. Conclusion

Based upon all of the foregoing, the circuit court's order is hereby affirmed.

Affirmed.

---

[19] Critically, Deputy DeWees testified that the exclusive purpose for entering petitioner's apartment was to execute the pick-up order for S.W. and that the decision to arrest petitioner was because of "[t]he way [S.W.] was hidden in the room."

16